Paul-Kenneth: Cromar, ID #567164
c/o Sheriff / Davis County Jail
800 West State Street
P.O. Box 618
Farmington, Utah 84025-0618
Phone: 801-451-4100
*Sui Juris* [pro se]

FILED US District Court-UT
SEP 27 '24 PM12:54

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA (DUNs #052714196), Plaintiff *in-error*, <br><br> v. <br><br> "PAUL KENNETH CROMAR", Defendant *in-error*. | Case No. 2:23-cr-00159-HCN-DBP <br><br> **Defendant's Motion to Take Judicial Notice of Law in the Decision of the Supreme Court of the United States in Moore v. United States** <br><br> District Judge Howard C. Nielson, Jr. <br> Magistrate Judge Dustin B. Pead |

Comes now, ©Paul Kenneth Cromar™,[1] "Ken Cromar", defendant *in-error*, *Sui Juris* [pro se], who hereby respectfully present on the record of this court this SUPPLEMENTAL AUTHORITY: **Defendant's Motion to Take Judicial Notice of Law in the Decision of the Supreme Court of the United States in *Moore v. United States*,** Number 22-800, decided June 20th 2024 (attached as Exhibit "A"), which appears to vindicate and exonerate him and require this instant case to be voided, vacated with his immediate release from his unjust 395 days of incarceration.

---

[1] Paul Kenneth Cromar, "Ken", is a red-blooded, living, breathing American Sovereign, as defined within eight (8) JUDICIAL NOTICES in the original (first of 18) court case 2:17-cv-01223-RJS.

1.   This instant *Motion* is submitted in support of defendant's previous *Motion to Vacate the Judgment and Set Aside the Verdict for LACK of subject-matter jurisdiction of the Court; and for Repeated Violations of the Legal Doctrines of collateral estoppel, judicial estoppel, and estoppel by judgment; and for Assuming a frivolous Argument Position* (see docket #152, #153).

2.   In this *Moore* decision the Supreme Court loudly declares, plainly and clearly, that the federal income tax is an ***indirect*** tax under authority of Article I, Section 8, clause 1, and is **not** a *direct* tax under authority of the 16th Amendment, confirming the defendant's argument that it is the court itself that has assumed the *frivolous* position in this litigation, *i.e.*: the court has declared that Article I, Section 8, clause 18 of the Constitution, the original *"Necessary and Proper" enabling enforcement clause* can be utilized by the court to take jurisdiction to enforce a direct tax without apportionment under authority of the 16th Amendment.    That is a patently *frivolous* position because, again, the Supreme Court  declares that the federal income tax is an ***indirect*** tax under authority of Article I, Section 8, clause 1, and is **not** a *direct* tax under authority of the 16th Amendment.

3.   This of course means that this district court has **improperly** and ***unlawfully*** **conducted** this entire criminal trial of the defendant **without** the *subject-matter jurisdiction* necessary to do so, because this court argued/ruled/held in an open hearing that its subject-matter jurisdiction was based on a power to tax income directly under alleged authority of the 16th Amendment, and the recently released *Moore* decision of the Supreme Court ***factually*** **proves** that was **NOT TRUE, nor correct,** beyond the shadow of any doubt at all, **that is FALSE.**   The alleged *subject-matter jurisdiction* of the court, despite numerous challenges, was **never** properly, legally, established or shown on the record of the action in the court, and there is **no** properly established, fully-granted, *subject-matter jurisdiction* of the court that is **shown anywhere on the record** of the action in the court, that could lawfully have been *taken* by the court over the criminal prosecution of the defendant for the income tax crimes alleged committed.   The court conducted the criminal trial without the granted jurisdiction to do so.   This court has been honored the opportunity to recognize the judicial significance of this landmark SCOTUS decision in *Moore* by setting aside the verdict vacating the judgment, and immediately releasing Defendant *in-error* Paul Kenneth Cromar, -- in the interest of justice.

4.    And now, in this *Moore* decision of the United States Supreme Court, that was just decided June 20th of this year (2024), SCOTUS plainly and clearly declares that it is fundamental constitutional law that income taxes are *foundationally* speaking, **_indirect_ taxes under Article I, Section 8, clause 1**, and that the federal personal income tax is **not a** *direct* tax under authority of the 16th Amendment that is **without** *subjectivity* to any constitutional limitation.  On page 2 of the *Moore Syllabus* it plainly and clearly states:

> (a) Article I of the Constitution affords Congress broad power to lay and collect taxes.  That power includes direct taxes—those imposed on persons or property—and indirect taxes—those imposed on activities or transactions. **Direct taxes must be apportioned among the States** according to each State's population, while indirect taxes are permitted without apportionment but must "be uniform throughout the United States," §8, cl. 1.  **Taxes on income are indirect taxes, and the Sixteenth Amendment confirms that taxes on income need not be apportioned.** *Moore v. United States,* No. 22–800,  Argued December 5, 2023 - Decided June 20, 2024.

## Constitutional Foundations as Determined by SCOTUS in *Moore*

5.    The court provides in the *Moore Opinion* itself (attached as Exhibit A) on pages 5-7:

> "Article I of the Constitution affords Congress broad "Power To lay and collect Taxes, Duties, Imposts and Excises." Art. I, §8, cl. 1.  That power includes "'two great classes of'" taxes—direct taxes and indirect taxes. *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 13 (1916).
>
> Generally speaking, *direct* taxes are those taxes imposed on persons or property. See *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 570–571 (2012). As a practical matter, however, Congress has **rarely** enacted direct taxes because the Constitution requires that **direct taxes be apportioned** among the States.  To be apportioned, direct taxes **must be imposed** "in Proportion to the Census of Enumeration." U.S. Const., Art. I, §9, cl. 4; see also §2, cl. 3. In other words, **direct taxes must be apportioned** among the States according to each State's population.
>
> So if Congress imposed a property tax on every American homeowner, the citizens of a State with five percent of the population would pay five percent of the total property tax, even if the value of their combined property added up to only three percent of the total value of homes in the United States. To pay five percent, the tax rate on the citizens of that State would need to be substantially higher than the tax rate in a neighboring State with the same population but more valuable homes.

To state the obvious, that kind of complicated and politically **unpalatable** result has **made direct taxes difficult to enact.** Indeed, the parties have cited <u>**no** apportioned **direct** taxes in the current Internal Revenue Code</u>, and it appears that Congress **has <u>not enacted</u>** an apportioned tax **since the Civil War**. See 12 Stat. 297; E. Jensen, The Taxing Power: A Reference Guide to the United States Constitution 89 (2005).

By contrast, *indirect* taxes are the familiar federal taxes imposed on activities or transactions. That category of taxes includes **duties, imposts,** and **excise** taxes, **<u>as well as income taxes.</u>** U. S. Const., Art. I, §8, cl. 1; Amdt. 16. Under the Constitution, <u>**indirect**</u> taxes must "be uniform throughout the United States." Art. I, §8, cl. 1. A "'tax is uniform when it operates with the same force and effect in every place where the subject of it is found.'" *United States* v. *Ptasynski*, 462 U. S. 74, 82 (1983).

Because <u>**income taxes are indirect taxes,**</u> they are permitted **under Article I, §8** without apportionment. As this Court has said, Article I, §8's grant of taxing power "is exhaustive," meaning that it could "never" reasonably be "questioned from the" Founding that it included the power "to lay and collect income taxes." *Brushaber*, 240 U. S., at 12–13. In 1861, Congress enacted the Nation's first unapportioned income tax. 12 Stat. 309. <u>The Civil War income tax was recognized as an indirect tax</u> "under the head of excises, duties and imposts." *Brushaber*, 240 U. S., at 15; see also *Springer* v. *United States*, 102 U. S. 586, 598, 602 (1881)

In 1895, however, in *Pollock* v. *Farmers' Loan & Trust Co.*, this Court held that a tax on income from property equated to a tax on the property itself, and thus was a direct tax that had to be apportioned among the States. 158 U. S. 601, 627–628. The *Pollock* decision sparked significant confusion and controversy throughout the United States.

Congress and the States responded to *Pollock* by approving a new constitutional amendment. Ratified in 1913, the Sixteenth Amendment rejected *Pollock*'s conflation of (i) income from property and (ii) the property itself. The Amendment provides: "The Congress shall have power to lay and collect taxes on incomes, *from whatever source derived*, without apportionment among the several States, and without regard to any census or enumeration." U. S. Const., Amdt. 16 (*emphasis* added).

Therefore, the **Sixteenth Amendment expressly confirmed** what had been the understanding of the Constitution before *Pollock*: **Taxes on income**—including taxes on income from property—**are indirect taxes** that need not be apportioned. *Brushaber*, 240 U. S., at 15, 18. Meanwhile, property taxes remain direct taxes that must be apportioned. See *Helvering* v. *Independent Life Ins. Co.*, 292 U. S. 371, 378–379 (1934)." *Moore* v. *United States,* No. 22-800, June 20, 2024, pg.5-7

6.   This SCOTUS decision means that this district court *erroneously* and *unlawfully* conducted the **entire** criminal trial of the defendant **without** the *subject-matter jurisdiction* to do so, and

**without** ever establishing on the record of the action in the court a legitimate *subject-matter jurisdiction* of the court that could be taken by the court over the criminal charges brought to trial of the defendant. Indeed, to date, no appealable written order has been entered onto the record of this court <u>before</u>, <u>during</u>, or <u>after</u> trial, despite multiple motions to dismiss for lack of subject matter jurisdiction, thus denying defendant *in-error Cromar* due process of law.

7.   The ***lack*** of *subject-matter jurisdiction* of this court to conduct the criminal trial of the defendant is now **obvious** and **irrefutable,** and the ***error*** is ***fatal*** and **irreparable** because this court ***dictated orally*** on the record in a hearing conducted by the court that the alleged jurisdiction of the court over the criminal prosecution of the defendant was based on an *alleged* power to enforce the federal income tax **as a *direct* tax under authority of the 16th Amendment** without any applicable *limitation*, which, by this *Moore* decision, was a ***fatal error*** of the court in its declaration asserting the alleged *subject-matter jurisdiction* taken over the criminal trial of the defendant.  There is absolutely **no** constitutional *subject-matter jurisdiction* granted to enforce the federal personal income tax <u>as a ***direct*** tax under alleged authority of the 16</u><sup>th</sup> Amendment, rather than as an ***indirect*** tax under authority of Article I, Section 8, clauses 1 and 18.   Under this new *Moore* decision from SCOTUS*,* the *alleged subject-matter jurisdiction **erroneously*** asserted by this district court itself, does **not** *constitutionally* **exist,** and **never** has existed. **THAT IS FATAL AND IRREPERABLE ERROR.**

8.   This court's claim to a *subject-matter jurisdiction* over the criminal trial, based on an alleged power to enforce a *direct* tax on income under alleged authority of the 16th Amendment, was a clear ***fatal error.***  This court ***lacked*** the *subject-matter jurisdiction* to conduct the criminal trial of the defendant under the 16th Amendment, which trial the court ***wrongfully*** allowed to occur and be conducted **without** a legitimate constitutional basis for the *subject-matter jurisdiction* alleged taken by the court under that Amendment.  The Supreme Court repeatedly asserts in this *Moore* decision that <u>the federal income tax is an ***indirect*** tax under the constitutional authority of Article I, Section 8, clause 1</u>, and is **not** a *direct* tax under the 16th Amendment as was ***erroneously assumed,*** and held, by this court during trial to *wrongfully* and *prejudicially* allege that a *jurisdiction* of the court that could be taken under the Amendment, existed, **when it did NOT**.

9.    The *Moore* SCOTUS decision **exposes** as ***erroneous*** the claim in this trial of both the DOJ and the IRS, that the income tax is a *direct* non-apportioned tax.  It is **not.**  It is an ***indirect*** tax, and **always has been** because the *Moore Opinion* cites the *Brushaber* decision in 1916 as the *controlling* case deciding that the federal income tax is an ***indirect*** tax under authority of Article I, Section 8, clauses 1 and 18, and is **not** a *direct* tax under authority of the 16th Amendment.    The new SCOTUS *Moore* decision exposes the **fact** that it is the IRS' *Frivolous Positions* document, and the DOJ's arguments in this case, that actually assert a **patently *frivolous*** position regarding the constitutional nature of the federal personal income tax, *i.e.*: that the 16th Amendment, despite **not** containing the word "*direct* " and **not having** an *enabling enforcement clause,* is nevertheless the source of authority in the courts for the enforcement of a *direct* tax on income without constitutional *limitation.*    That is a ***patently fraudulent*** argument in this case and the time has come for these federal courts to **shut-down** the ***fraudulent*** enforcement of the federal income tax by the both the IRS and the DOJ (and the lower courts themselves in many cases) as a *direct* tax **without** *limitation.*  Under *Moore,* SCOTUS plainly and clearly says **that** is **NOT** authorized by the 16th Amendment because the tax is an ***indirect*** tax under Article I, Section 8, - and is **NOT** a *direct* tax.

10.    The federal income tax is an ***indirect*** tax and is **not** a *direct* tax as ***erroneously*** asserted in those IRS *Frivolous Position* documents, and by the plaintiff in this case.  Here is the IRS/DOJ ***frivolous position argument*** #6, *verbatim*, from that *Frivolous Position* document, which (position) is now ***irrefutably exposed*** by the *Moore* decision, as **complete legal *nonsense*** that this court is now ***compelled*** by the SCOTUS decision to **reject** and **correct**, regardless of the jury's verdict.

> **"6.  Contention: The Sixteenth Amendment does not authorize a direct non-apportioned federal income tax on United States citizens.**
>
> Some assert that the Sixteenth Amendment does not authorize a direct non-apportioned income tax and thus, U.S. citizens and residents are not subject to federal income tax laws. …
>
> **The Law:** The constitutionality of the Sixteenth Amendment has invariably been upheld when challenged. And numerous courts have both implicitly and explicitly recognized that the Sixteenth Amendment

authorizes a **non-apportioned direct income tax** on United States citizens

11.  The *Moore* decision **exposes** the above IRS "*direct* tax" *jurisdictional* argument as a completely *fraudulent* argument.  The district court has based this entire criminal trial of the Defendant in-error, Ken Cromar, on a ***fraudulent argument*** and claim of jurisdiction, when **none existed**.   *Moore* also **exposes** the ***wrongful*** *operational* practice of the IRS in its *defacto* administrative process of assessing the tax as a ***direct*** tax without *limitation,* instead of as an *indirect* tax, and without regard to the defendant's ***lack*** of any legal *subjectivity* to any *Impost, Duty,* or *Excise* tax (and or taxation) in law that applies to the activities he has engaged in. Therefore, SCOTUS' controlling *Moore* decision requires this court to take Judicial Notice, recognize its understandable error, void and vacate the case *ab initio* and release defendant Paul Kenneth Cromar immediately – in the interest of justice.

12.  This court ***unlawfully*** conducted the entire criminal trial of the defendant under an ***erroneous claim*** to its alleged *subject-matter jurisdiction,* and now that the Supreme Court has **exposed** the ***fatal error*** in the claimed *subject-matter jurisdiction* of the court; thus the court has no option left to it, within its legal discretion, except to **vacate** the judgment of the court and **set aside** the jury verdict, which was rendered by a court that ***lacked*** jurisdiction under the 16th Amendment to enforce the *direct* tax on "*income*" that was *operationally* assessed by the IRS, operating under the **same erroneous** belief that the income tax was a *direct* tax without the *apportionment* that is still **required** of all *direct* taxes according to the Supreme Court in this ***controlling*** *Moore* decision. This was ***fatal error*** committed by the plaintiff's IRS in alleging an ***invalid*** assessment of a *direct* tax laid upon an individual citizen, rather than laid by the required *apportionment,* upon the fifty states.

13.  This *Moore* decision of course, simply reasserts the consistent rulings of the high court across 100 years of litigation, which the plaintiff's Department of Justice repeatedly and consistently ***erroneously*** labels as *frivolous* in it argued ***reversal*** of the High Court's true holdings on the constitutional nature of the federal income tax, which the defendant *in-error* Cromar faithfully recites again for the court, just as he has ***correctly*** done over the last 8 months of these criminal trial proceedings; - even while the plaintiff DOJ has argued nothing but ***frivolous*** **nonsense** and

*fatal error,* or has refused to make any argument at all sufficient to legally establish the lawful *subject-matter jurisdiction* of the court that has been supposedly taken over this criminal prosecution and trial of the defendant, and allow the court to enforce, *allegedly* under the 16th Amendment, a **non-existent,** *direct* tax on *income* **without** *subjectivity* to any constitutional *limitation,* as **erroneously** argued by the plaintiff in these criminal trial proceedings.

### *Moore* Joins List Of Other SCOTUS' Decisions

This *Moore* decision now joins the long list of SCOTUS rulings on this matter:

> "… by the previous ruling [*Brushaber v Union Pacific R. Co.*] it was settled that the provisions of the Sixteenth Amendment **conferred no new power of taxation** but simply **prohibited** the previous complete and plenary power of income taxation possessed by Congress from the beginning **from being taken out of the category of indirect taxation to which it inherently belonged** …." *Stanton v. Baltic Mining Co.*, 240 U.S. 103, 112-113 (1916)
>
> *(emphasis added)*

> "Whether the tax is to be classified as an "**excise**" is in truth not of critical importance. If not that, it is an "**impost**" (*Pollock v. Farmers' Loan & Trust Co.,* 158 U. S. 601, 158 U. S. 622, 158 U. S. 625; *Pacific Insurance Co. v. Soble,* 7 Wall. 433, 74 U. S. 445), or a "**duty**" (*Veazie Bank v. Fenno,* 8 Wall. 533, 75 U. S. 546, 75 U. S. 547; *Pollock v. Farmers' Loan & Trust Co.,* 157 U. S. 429, 157 U. S. 570; *Knowlton v. Moore,* 178 U. S. 41, 178 U. S. 46). A **_capitation_ or other "_direct_" tax it certainly is not.**" *Steward Mach. Co. v. Collector*, 301 U.S. 548 (1937), at 581-2
>
> *(emphasis added)*

> "The subject matter of taxation open to the power of the Congress is as comprehensive as that open to the power of the states, though the method of apportionment may at times be different. "The Congress shall have power to lay and collect taxes, duties, imposts and excises." Art. 1, § 8. **If the tax is a direct one, it shall be apportioned** according to the census or enumeration. **If it is a duty, impost, or excise, it shall be uniform** throughout the United States. **Together, these classes include every form of tax appropriate to sovereignty.** *Cf. Burnet v. Brooks,* 288 U. S. 378, 288 U. S. 403, 288 U. S. 405; *Brushaber v. Union Pacific R. Co.,* 240 U. S. 1, 240 U. S. 12." *Steward Mach. Co. v. Collector*, 301 U.S. 548 (1937), at 581
>
> *(emphasis added)*

> "The [income] tax **being an excise**, its imposition must conform to the canon of **uniformity**. There has been no departure from this requirement. According to the settled doctrine the uniformity exacted is geographical, not intrinsic. *Knowlton v. Moore, supra,* p. 178 U. S. 83; *Flint v. Stone Tracy Co., supra,* p. 220 U. S. 158;

*Billings v. United States,* 232 U. S. 261, 232 U. S. 282; *Stellwagen v. Clum,* 245 U. S. 605, 245 U. S. 613; *LaBelle Iron Works v. United States,* 256 U. S. 377, 256 U. S. 392; *Poe v. Seaborn,* 282 U. S. 101, 282 U. S. 117; *Wright v. Vinton Branch Mountain Trust Bank,* 300 U. S. 440." *Steward Mach. Co. v. Collector*, 301 U.S. 548 (1937), at 583

(<em>emphasis</em> added)

"***Duties*** and ***imposts*** are terms commonly applied to levies made by governments **on the <u>importation or exportation</u> of commodities**. Excises are "taxes laid upon the manufacture, sale or consumption of commodities within the country, upon licenses to pursue certain occupations, and upon corporate privileges ... ***the requirement to pay*** *such taxes <u>**involves the exercise of the privilege**</u> and if business is not done in the manner described no tax is payable...it is the privilege which is the subject of the tax and not the mere buying, selling or handling of goods.*" Cooley, Const. Lim., 7th ed., 680." *Flint v. Stone Tracy Co.,* 220 U.S. 107, 151,  31 S.Ct. 342, 349 (1911)

(<em>emphasis</em> added)

"The Sixteenth Amendment, although referred to in argument, has no real bearing, and may be put out of view. As pointed out in recent decisions, it **does <u>not extend</u> the taxing power to new or excepted subjects**, but merely removes all occasion which otherwise might exist for an apportionment among the states of taxes laid on income, whether it be derived from one source or another. *Brushaber v. Union Pacific R. Co.,* <u>240 U. S. 1</u>, <u>240 U. S. 17</u>-19; *Stanton v. Baltic Mining Co.,* <u>240 U. S. 1</u>03, <u>240 U. S. 112</u>-113.*"* *Peck & Co v. Lowe*, 247 U.S. 165 (1918), at 172-3

(<em>emphasis</em> added)

"Moreover in addition the conclusion reached in the *Pollock* case did not in any degree involve holding that income taxes generically and necessarily came within the class of direct taxes on property, but on the contrary recognized the fact that **taxation on income was in its nature an excise** entitled to be enforced as such unless and until it was concluded that to enforce it would amount to accomplishing the result which the requirement as to apportionment of direct taxation was adopted to prevent, in which case the duty would arise to disregard form and consider substance alone and <u>hence subject the tax to the regulation as to apportionment</u> which otherwise as an excise would not apply to it." *Brushaber*, supra, at 16-17.

(<em>emphasis</em> added)

"The various propositions are so intermingled as to cause it to be difficult to classify them. We are of opinion, however, that the confusion is not inherent, but rather arises from the conclusion that the Sixteenth Amendment provides for a hitherto unknown power of taxation, that is, a power to levy an income tax which although direct should not be subject to the regulation of apportionment applicable to all other direct taxes. **And the far-reaching effect <u>of this erroneous</u>**

**assumption will be made clear** by generalizing the many contentions advanced in argument to support it," *Brushaber, supra,* at 10-11

*(emphasis* added)

"But it clearly results that the proposition and the contentions under it, **if acceded to,** would cause one provision of the Constitution to **destroy** another; that is, they would result in bringing the provisions of the Amendment exempting a direct tax from apportionment into **irreconcilable conflict** with the general requirement that **all direct taxes be apportioned.** Moreover, the tax authorized by the Amendment, being direct, would **not** come under the rule of *uniformity* applicable under the Constitution to other than direct taxes, and thus it would come to pass that the result of the Amendment would be to authorize a particular *direct* tax **not subject either** to *apportionment* **or** to the rule of *geographical uniformity,* thus giving power to impose a different tax in one state or states than was levied in another state or states. This result, **instead** of **simplifying** the situation and **making clear the limitations** on the taxing power, which **obviously** the Amendment must have been **intended to accomplish,** would create **radical and destructive changes** in our constitutional system and **multiply confusion**." *Brushaber, supra* at 12

*(emphasis* added)

"***Duties*** and ***imposts*** are terms commonly applied to levies made by governments **on the importation or exportation of commodities** . Excises are "taxes laid upon the manufacture, sale or consumption of commodities within the country, upon licenses to pursue certain occupations, and upon corporate privileges ... ***the requirement to pay*** *such taxes* ***involves the exercise of the privilege*** *and if business is not done in the manner described no tax is payable...it is the privilege which is the subject of the tax and not the mere buying, selling or handling of goods.*" Cooley, Const. Lim., 7th ed., 680." *Flint v. Stone Tracy Co.,* 220 U.S. 107, 151,  31 S.Ct. 342, 349 (1911)[2]

*(emphasis* added)

The tax under consideration, as we have construed the statute, **may be described as an excise upon the particular privilege of doing business in a corporate capacity,** i.e., with the advantages which arise from corporate or quasi corporate organization; or, when applied to insurance companies, for doing the business of such companies. As was said in the Thomas Case, 192 U. S. supra, **the requirement to pay such taxes involves the exercise of privileges,** and the element of absolute and unavoidable demand is lacking. If business is not done in the manner described in the statute, no tax is payable. **If we are correct in holding that this is an excise tax, there is nothing in the Constitution requiring such taxes to be apportioned according to population.** *Pacific Ins. Co. v. Soule,* 7 Wall. 433, 19 L. ed. 95; *Springer v. United States*, 102 U.S. 586, 26 L. ed. 253; *Spreckels Sugar Ref. Co. v. McClain*, 192 U.S. 397, 48 L. ed. 496, 24

---

[2] Again, *Flint v. Stone Tracy Co*. is controlling and Constitutional law, having been cited and followed over 600 times by virtually every court as the authoritative definition of the scope of excise taxing power.

Sup. Ct. Rep. 376." *Flint v. Stone Tracy Co.*, 220 US 107, 151-152 (1911)" *Thomas v. United States*, <u>192 U.S. 363</u>, 48 L. ed. 481, 24 Sup. Ct. Rep. 305
(*emphasis* added)

"Evidently Congress adopted the income as the ***measure*** of the tax to be imposed with respect to the doing of business in corporate form because it desired that **the excise** should be imposed, approximately at least, with regard to the amount of benefit presumably derived by such corporations from the current operations of the government. In *Flint v. Stone Tracy Co*. 220 U.S. 107, 165 , 55 S. L. ed. 107, 419, 31 Sup. Ct. Rep. 342, Ann. Cas. 1912 B. 1312, it was held that Congress, in exercising the right to tax a **legitimate** <u>*subject* of taxation</u> **as a franchise or privilege**, was not debarred by the Constitution from ***measuring*** the taxation by the total income, although derived in part from property which, considered by itself, was not taxable. It was reasonable that Congress should fix upon gross income, without distinction as to source, as a convenient and sufficiently <u>accurate index</u> of the importance of the business transacted." *Stratton's Independence, Ltd. V. Howbert,* 231 U.S. 399, at 416 – 417 (1913)          (*emphasis* added)

"As **repeatedly** held, this did **not extend** the taxing power **to new subjects**, but merely removed the necessity which otherwise might exist for an apportionment among the states of taxes laid on income. *Brushaber v. Union Pacific R. R. Co.*, 240 U.S. 1 , 17-19, 36 Sup. Ct. 236, Ann. Cas. 1917B, 713, L. R. A. 1917D, 414; *Stanton v. Baltic Mining Co.*, 240 U.S. 103 , 112 et seq., 36 Sup. Ct. 278; *Peck & Co. v. Lowe*, 247 U.S. 165, 172, 173 S., 38 Sup. Ct. 432." *Eisner vs. Macomber*, 252 U.S. 189 (1920), at pg. 205          (*emphasis* added)

13)    And with respect to the legal requirement, and judicial duty of the court, to properly establish on the record of the action the fully granted *subject-matter jurisdiction* of the court that can lawfully be *taken* by it over the criminal prosecution of a defendant in the court, **before** proceeding at trial, the court has plainly and clearly said:

A court may not render a judgment which transcends the limits of its authority, and a judgment is void if it is beyond the powers granted to the court by the law of its organization, even where the court has jurisdiction over the parties and the subject matter. Thus, if a court is authorized by statute to entertain jurisdiction <u>in a particular case only</u> and <u>undertakes to exercise the jurisdiction conferred</u> **in a case to which the statute has no application**, the judgment rendered is void. The **lack of statutory authority** to make particular order or a judgment is **akin to lack of subject matter jurisdiction** and is subject to collateral attack. 46 Am. Jur. 2d, Judgments § 25, pp. 388-89.          (*emphasis* added)

11

"It remains rudimentary law that "[a]s regards all courts of the United States inferior to this tribunal, two things are necessary to create jurisdiction, whether original or appellate. The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it .... To the extent that such action is not taken, the power lies dormant." *The Mayor v. Cooper,* 6 Wall. 247, 252, 18 L.Ed. 851 (1868); accord, *Christianson v. Colt Industries Operating Co., 486 U.S. 800,* 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988); *Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368,* 379-380, 101 S.Ct. 669, 676-677, 66 L.Ed.2d 571 (1981); *Kline v. Burke Construction Co.,* 260 U.S. 226, 233-234, 43 S.Ct. 79, 82-83, 67 L.Ed. 226 (1922); *Case of the Sewing Machine Companies,* 18 Wall. 553, 577-578, 586-587, 21 L.Ed. 914 (1874); *Sheldon v. Sill,* 8 How. 441, 449, 12 L.Ed. 1147 (1850); *Cary v. Curtis,* 3 How. 236, 245, 11 L.Ed. 576 (1845); *McIntire v. Wood,* 7 Cranch 504, 506, 3 L.Ed. 420 (1813). *Finley v. United States,* 490 U.S. *545* (1989).    The Supreme Court has repeatedly told the federal judiciary it may **not rely** on a conclusive **presumption** to find against a defendant on an **essential element of a cause of action**. *See Sandstrom v. Montana,* 442 U.S. 510, 521-523, 99 S.Ct. 2450, 2458-2459 (1979); *Stanley v. Illinois,* 405 U.S. 645, 654-657, 92 S.Ct. 1208,   1214-1216 (1972); *Heiner v. Donnan,* 285 U.S. 312, 325-29, 52 S.Ct. 358, 360-362 (1932); *Schlesinger v. State of Wisconsin,* 270 U.S. 230, 46 S.Ct. 260 (1926); *Tot v. United States,* 319 U.S. 463, 468-69, 63 S.Ct. 1241, 1245-1246 (1943); *Vlandis v. Kline,* 412 U.S. 441, 446, 93 S.Ct. 2230, 2233 (1973); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 318-19, 119 S.Ct. 1961, 1977 (1999), and *Jones v. Bolles,* 76 U.S. 364, 368 (1869).

(*emphasis* added)

"... in a long and venerable line of our cases. "Without jurisdiction the court **cannot proceed at all in any cause**. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 7 Wall. 506, 514 (1869). ... The requirement that jurisdiction **be established** <u>as a threshold matter</u> "spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U.S. 379, 382 (1884). ... The statutory **and (especially) constitutional elements of jurisdiction are an essential** ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. See *United  States* v. *Richardson,* 418   U.S.   166,   179   (1974);   *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U.S. 208, 227 (1974). For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, **by very definition**, for a court to act **ultra vires**. *Steel Co., aka Chicago Steel & Pickling Co. v. Citizens for a Better Environment,* No. 96-643, 90 F.3d 1237 (1998)

(*emphasis* added)

"**There is no discretion to ignore lack of jurisdiction**." *Joyce v. U.S.*, 474 F.2d 215 (1973).

"So, we conclude, as we did in the prior case, that, although these suits may sometimes so present questions arising under the Constitution or laws of the United States that the Federal courts will have jurisdiction, yet the mere fact that a suit is an adverse suit authorized by the statutes of Congress is **not** in and of itself **sufficient to vest jurisdiction in the Federal courts**." *Shoshone Mining Co. v. Rutter, 177 U.S. 505, 513* (1900).

(*emphasis* added)

The Supreme Court has repeatedly told the federal judiciary it **may not rely on a conclusive presumption** to find against a defendant on an essential element of a cause of action. *See Sandstrom v. Montana*, 442 U.S. 510, 521-523, 99 S.Ct. 2450, 2458-2459 (1979); *Stanley v. Illinois*, 405 U.S. 645, 654-657, 92 S.Ct. 1208, 1214-1216 (1972); *Heiner v. Donnan*, 285 U.S. 312, 325-29, 52 S.Ct. 358, 360-362 (1932); *Schlesinger v. State of Wisconsin*, 270 U.S. 230, 46 S.Ct. 260 (1926); *Tot v. United States*, 319 U.S. 463, 468-69, 63 S.Ct. 1241, 1245-1246 (1943); *Vlandis v. Kline*, 412 U.S. 441, 446, 93 S.Ct. 2230, 2233 (1973); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19, 119 S.Ct. 1961, 1977 (1999), and *Jones v. Bolles*, 76 U.S. 364, 368 (1869).

(*emphasis* added)

"Federal courts are courts of limited jurisdiction. They possess only power authorized by Constitution and statute, which is **not to be expanded by judicial decree.** It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkenen v. Guardian Life Ins. Co. of America,* 511 US 375 (1994)

(*emphasis* added)

"But it clearly results that the proposition and the contentions under it, **if acceded to**, would cause one provision of the Constitution to **destroy** another; that is, they would result in bringing the provisions of the Amendment exempting a direct tax from apportionment into **irreconcilable conflict** with the general requirement that **all direct taxes be apportioned**. Moreover, the tax authorized by the Amendment, being direct, would **not** come under the rule of *uniformity* applicable under the Constitution to other than direct taxes, and thus it would come to pass that the result of the Amendment would be to authorize a particular *direct* tax **not subject either** to *apportionment* **or** to the rule of *geographical uniformity*, thus giving power to impose a different tax in one state or states than was levied in another state or states. This result, **instead of simplifying** the situation and **making clear the limitations** on the taxing power, which **obviously** the Amendment must have been **intended to accomplish**, would create **radical and destructive changes** in

13

our constitutional system and **multiply confusion**." *Brushaber v. Union Pacific RR Co,* 240 U.S. 1, pg. 12 (1916)

(*emphasis* added)

"By the previous ruling [*Brushaber v Union Pacific R. Co.*] it was settled that the provisions of the Sixteenth Amendment **conferred no new power of taxation** but simply **prohibited** the previous complete and plenary power of income taxation possessed by Congress from the beginning **from being taken out of the category of indirect taxation to which it inherently belonged** ...." *Stanton v. Baltic Mining Co.*, 240 U.S. 103, 112-113 (1916)

(*emphasis* added)

"A void judgment is one that has been procured by extrinsic or collateral fraud or entered by a court that did not have jurisdiction over the subject matter or the parties." *Rook v. Rook*, 233 Va. 92, 95, 353 S.E.2d 756, 758 (1987)

### Jurisprudence Duty To Set Aside Verdict And Vacate Judgment

14)      Therefore, under the controlling *Moore, Brushaber,* and *Baltic Mining* decisions, SCOTUS makes clear this court now has a legal, *jurisprudence,* **duty** to **set aside** the jury verdict and **vacate** the court judgement for the **proven** *fatal lack* of any *subject-matter jurisdiction* of the court that is clearly shown on the record of the action in the court, or that could have been lawfully *taken* by the court under authority of the 16th Amendment as **erroneously** argued, *sufficient* to allow this court to have conducted a criminal trial of the defendant for an alleged failure to pay a *direct* tax on income **without** *limitation*, as **erroneously** argued by the plaintiff Government's  DOJ and **wrongfully** assessed in *operational practice* by the plaintiff United States' IRS.  And this district court has **wrongfully** and **erroneously** done so as well, at trial; by enforcing the income tax as a *direct* tax under alleged authority of the 16th Amendment, ***relieved*** of all *subjectivity* to **any** constitutional *limitation* imposed on the federal taxing powers, instead of as an *indirect* tax under authority of Article I, Section 8.    These were all ***fatally erroneous*** arguments and holdings made by the plaintiff and the court, which are **ALL NOW EXPOSED AS SUCH** *frivolity*, *irrefutably*, as a ***factual*** result of the *Moore* decision taken in June 2024. And by extension *Moore* vindicates and exonerates defendant *in-error* Paul Kenneth Cromar, requiring this court to exercise its jurisprudence by voiding and vacating the case and releasing him as part of remedy.

15)     When combined with the evidence of the <u>Constitutional Authority Statement</u> for the new tax law that was adopted by Congress in 2018, it is **impossible** for an honest man (or judge) to continue to conclude that the federal income tax is a *direct* tax under the 16th Amendment, as that <u>Constitutional Authority Statement</u> for the new tax law plainly and clearly establishes the constitutional authority for the federal income tax laws under the **sole** authority of Article I, Section 8, clauses 1 and 18 - as a constitutionally enforceable ***indirect*** tax, - and **not** as an ***unenforceable*** *direct* tax under the 16th Amendment, - as was erroneously argued and held in this criminal case by the plaintiff and the district court.

**Constitutional Authority Statement**

[Congressional Record Volume 163, Number 178 (Thursday, November 2, 2017)]
From the Congressional Record Online through the Government Publishing Office
[www.gpo.gov]
By Mr. BRADY of Texas:
H.R. 1.
Congress has the power to enact this legislation pursuant
to the following:
Article I, Section 8, Clause 1 of the Constitution of the
United States.
[Page H8444]


**About Constitutional Authority Statements**

On January 5, 2011, the House of Representatives adopted an amendment to House
Rule XII. Rule XII, clause 7(c) requires that, to be accepted for introduction by the

16)     Consequently, the district court ***lacked*** the *subject-matter jurisdiction* required to conduct a criminal trial of the defendant under the 16th Amendment, rather than under Article I.   The jury verdict must be ***vacated*** and ***set aside*** because the district court ***erroneously*** conducted the entire trial without a proper and correct declaration, and establishment, of the **required**, specific, *subject-matter jurisdiction* of the court *taken,* necessary to conduct that criminal trial.

17)     And, because the United States' IRS operationally ***erroneously*** assessed the tax administratively as though it were a *direct* tax under the 16th Amendment, and **not** as a function of any *indirect* taxation by *Impost, Duty,* or *Excise,* the fatal **defect** in the jurisdiction **cannot** be *cured* or *perfected* because the underlying nature of the IRS claim cannot now be altered from that

*erroneous* assessment of a *direct* tax, instead of an *indirect* one.  The claim made in this case, - that income tax is owed by the defendant, is fundamentally without constitutional foundation to support the *direct* manner in which the tax was operationally assessed by the IRS without use of the underlying foundation of any written *Impost, Duty* or *Excise* tax law that is applicable*, means that all of the criminal charges **must be dismissed with *prejudice*** after the jury verdict is ***set aside*** and the judgment ***vacated*** for ***lack*** of *subject-matter jurisdiction*, and defendant *in-error* Cromar be released.

18)    It is now absolutely clear that the Jury Instruction provided by the court to the jury, telling the jury that the federal income tax to be enforced by them through their verdict, was a *direct* tax on all *income,* which was authorized under the 16th Amendment, was **wrong.**  Cromar objected to these Jury Instruction calling them "inaccurate and misleading" That instruction **exceeded** the constitutionally granted authority to tax *income* **only** *indirectly* under authority of Article I, Section 8, clause 1, - by *Duty, Impost* and *Excise,* as declared in the Congressional Record by Congress in writing the law, and now, as **finalized** by the Supreme Court with the last word on the matter, as plainly written in this new *Moore* decision.  It was a ***fatally erroneous***  instruction that was given to the jury, and that fact alone is sufficient to warrant the court's **setting aside** the jury verdict and **vacating** the judgment, and ordering the ***dismissal*** of the entire action **with *prejudice***, as both the plaintiff and the court have *fatally* refused to address this **constitutional** legal **fact of law** about the ***indirect*** nature of the federal personal income tax under Article I, Section 8 of the U.S. Constitution, and **not** the 16th Amendment.   Again, the ***erroneous*** jury instruction given to the jury about the ***erroneously*** alleged *constitutional* nature of the tax, is **sufficient cause alone** for the defendant's *Motion* for a new trial to be granted if the case is not to be *dismissed* in its entirety.

> "...We admit, as all must admit, that the powers of the government **are limited**, and that its limits are **not to be transcended**.  But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people.  Let the end be legitimate, let it be **within** the **scope** of the constitution, and all means which are appropriate, which are plainly adapted to that end, **which are not prohibited**, but

**consistent** with the **letter** and **spirit** of the constitution, are constitutional ..." *McCulloch v. State of Maryland*, 17 U.S. 316 (1819) [i]

19)   The Supreme Court's decision in *Moore* **exposes the fact that:**

a. the United States' (IRS's) assessment of the tax as a *direct* tax under alleged authority of the 16th Amendment to tax *directly* and **without** applicable *limitation*, was **unconstitutional;**

b. the United States' (DOJ's) enforcement of the tax in the instant criminal trial, as a *direct* tax under alleged authority of the 16th Amendment, was **unconstitutional;**

c. the United States' (DOJ's) enforcement of the tax in the instant criminal trial, as a *direct* tax **without** any applicable *limitation*, was **unconstitutional;**

d. the United States' (DOJ's) enforcement of the tax in the previous *civil* trial of the defendant, in which the defendant's home was wrongfully taken by this same district court **without** *jurisdiction* to enforce the *direct* taxes alleged owed under authority of the 16th Amendment, was **unconstitutional;**

e. this district court's criminal conviction of the defendant for allegedly not complying with *direct* income tax laws that **do not exist** under Article I, Section 8, in order to allegedly permit the *direct* taxation of the defendant's "income" under alleged authority of the 16th Amendment **without** applicable *limitation*, was **unconstitutional;**

f. this district court's ***erroneous*** reliance on the *Balice v United States* decision to allegedly take jurisdiction under the 16th Amendment and Article I, Section 8, clause 18, - to enforce the tax on income as a *direct non-apportioned tax*; was ***fatal error*** and was also, like everything else in this case, **unconstitutional;** and finally, that:

g. this district court conducted **both** the previous civil trial in 2018, and the instant subject criminal trial in 2024, **without** the *subject-matter jurisdiction* in either case, necessary to conduct any trials at all, civil or criminal, and was thus, **ALL unconstitutional.**

20)     Finally, the exposed *lack* of any grant of *subject-matter jurisdiction* that can lawfully be *taken* under the alleged source of constitutional authority of the 16th Amendment, means that in addition to *vacating* the jurisdiction-less judgment and *setting aside* the jury verdict, the court must also immediately release the defendant from jail, as there is no legal basis or jurisdiction remaining for the court to invoke to support the sentencing of a defendant that was convicted by a court that *lacked* the *subject-matter jurisdiction* to conduct the criminal trial in the first place.

21)     Defendant cannot be lawfully held, or sentenced by the court, on charges of failing to pay a *direct* income tax, or for allegedly violating laws that allegedly enforce the payment of a *direct* tax on *income* under *alleged* authority of the 16th Amendment because the Supreme Court says that "*Because <u>income taxes are indirect taxes</u>, they are permitted under Article I, §8 without apportionment*".   This *forecloses* the court's assumed position and **shuts out** the plaintiff from making any further *spurious, frivolous,* "direct tax under the 16th Amendment" arguments.

22)     This district court conducted the entire criminal trial of the defendant **without** the required *subject-matter jurisdiction* necessary to do so.   That was a *fatal and irreparable ERROR.*   The verdict must be *vacated,* the judgment must be *set aside*, and the defendant must be **released immediately** from his confinement in jail, as a court **without** *jurisdiction* cannot hold a man in jail to be sentenced for breaking a law that **doesn't exist** and **never did** - because *income* taxes are *indirect* taxes, **not** *direct* taxes, and they do not constitute the lawful and legitimate *direct taxation* that the defendant was *wrongfully* allowed by the court to be convicted of allegedly "evading and defeating".

23)     This district court *lacked* the *subject-matter jurisdiction* of the court necessary to have conducted a criminal trial of the defendant, and now the court has no other lawful choice but to *set aside* the verdict, *vacate* the judgment, and *release* the defendant because a court *lacking* subject-matter jurisdiction **cannot** conduct a trial of the defendant, **cannot** render a verdict or allow a jury to do so, and **cannot** enter a judgment in a criminal prosecution for which the court possesses **no** valid, fully granted, and enforceable, s*ubject-matter jurisdiction* of the court that can lawfully be *taken* by the court over the specific criminal charges made against a defendant.

"Once jurisdiction is challenged, the court cannot proceed when it clearly appears that the court lacks jurisdiction, the court has no authority to reach merits, but rather should dismiss the action." *Melo v. U.S.*, 505 F.2d 1026 (1974)

## PRAYER FOR JUSTICE & RELIEF

24)     Defendant *in-error* Paul Kenneth Cromar has now unjustly suffered 395 days of incarceration, in physical and mental anguish. Defendant now prays that this honorable court, under the Federal Rules of Criminal Procedure (F.R.Crim.P.), Rule 29(c) and Rule 12(b)(2) - *Lack Of Subject-Matter Jurisdiction*; will now honestly address this obvious **fatal defect** and **deficiency** in the *subject-matter jurisdiction* of the court, which is now **fully exposed** and **proven** by the Supreme Court itself under this recent *Moore* decision, to be a **factual, fatal defect** and **deficiency** in the alleged *subject-matter jurisdiction* of the court *alleged* taken and **erroneously** relied upon by the court to conduct the criminal trial of the defendant, *and* **set aside** the verdict, **vacate** the judgment, and **dismiss** this action in its entirety **with** *prejudice*, for **lack** of a *subject-matter jurisdiction* of the federal district court to entertain this action under alleged authority of the 16th Amendment to enforce the income tax as the *direct non-apportioned* tax that was *wrongfully* assessed in *operational practice* by the plaintiff's IRS, and was **erroneously** argued for enforcement (by conviction) by the plaintiff's DOJ throughout this trial; - which argument and claim (of a *direct non-apportioned* tax on income) is herein above exposed by the Supreme Court through it's *Moore* decision in June of 2024, as **irreversible, fatal, error.** Paul Kenneth Cromar, defendant *in-error*, has now suffered 395 days of incarceration, defamation of character, harm and damage to his Life, Liberty, theft of his property, and dishonor to his reputation. To hold Cromar any longer without lawful jurisdiction is prejudicial, and therefore Cromar must be immediately released in the interest of justice.

Presented in honor on this 27th day of September, in the year of our Lord Jesus Christ, anno domini, 2024.

©
by: *Paul-Kenneth: Cromar* ™

_____

Paul-Kenneth: Cromar

Signed only in correct public capacity as the soul
HEIR/Executor to Paul-Kenneth: House of
Cromar Estate.

CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2024, I personally placed in the United States
Mail to the individuals named below a true and correct copy of **Defendant's Motion to Take
Judicial Notice of Law in the Decision of the Supreme Court of the United States in Moore
v. United States.**

TRINA A. HIGGINS
PATRICK BURNS
MEREDITH M. HAVEKOST
Attorneys of the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111

Raland Brunson

**End Note**

i "The subject is the execution of those great powers on which the welfare of a nation essentially
depends. It must have been the intention of those who gave these powers, to insure, so far as
human prudence could insure, their beneficial execution. This could not be done, by confiding
the choice of means to such narrow limits as not to leave it in the power of congress to adopt any
which might be appropriate, and which were conducive to the end. This provision is made in a
constitution, intended to endure for ages to come, and consequently, to be adapted to the various
crises of human affairs. To have prescribed the means by which government should, in all future
time, execute its powers, would have been to change, entirely, the character of the instrument,
and give it the properties of a legal code. It would have been an unwise attempt to provide, by
immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which
can be best provided for as they occur. To have declared, that the best means shall not be used,
but those alone, without which the power given would be nugatory, would have been to deprive
the legislature of the capacity to avail itself of experience, to exercise its reason, and to
accommodate its legislation to circumstances. If we apply this principle of construction to any of
the powers of the government, we shall find it so pernicious in its operation that we shall be
compelled to discard it.....

20

The baneful influence of this narrow construction on all the operations of the government, and the absolute impracticability of maintaining it, without rendering the government incompetent to its great objects, might be illustrated by numerous examples drawn from the constitution, and from our laws. The good sense of the public has pronounced, without hesitation, that the power of punishment appertains to sovereignty, and may be exercised, whenever the sovereign has a right to act, as incidental to his **constitutional powers**. It is a means for carrying into execution all sovereign powers, and may be used, although not indispensably necessary. It is a right incidental to the power, and conducive to its beneficial exercise.... We think so for the following reasons: 1st. The clause is placed among the powers of congress, not among the limitations on those powers. 2nd. Its terms purport to enlarge, not to diminish the powers vested in the government. It purports to be an additional power, not a restriction on those already granted. No reason has been, or can be assigned, for thus concealing an intention to narrow the discretion of the national legislature, under words which purport to enlarge it. The framers of the constitution wished its adoption, and well knew that it would be endangered by its strength, not by its weakness....We admit, as all must admit, that the powers of the government **are limited**, and that its limits are **not to be transcended**. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. **Let the end be legitimate**, let it be **within the scope** of the constitution, and all means which are appropriate, which are plainly adapted to that end, **which are not prohibited**, but consistent with the letter and spirit of the constitution, are constitutional ..." *McCulloch v. State of Maryland*, 17 U.S. 316 (1819)

# EXHIBIT A

(Slip Opinion)          OCTOBER TERM, 2023          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MOORE ET UX. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 22–800.   Argued December 5, 2023—Decided June 20, 2024

Congress generally taxes the income of American business entities in one
of two ways.  Some entities, such as S corporations and partnerships,
are taxed on a pass-through basis, where the entity itself does not pay
taxes.  26 U. S. C. §§1361–1362.  Instead, the entity's income is
attributed to the shareholders or partners, who then pay taxes on that
income even if the entity has not distributed any money or property to
them.  §§61(a)(12), 701, 1366(a)–(c).  Other business entities do pay
taxes directly on their income.  Those entities' shareholders ordinarily
are not taxed on that income but are taxed when the entity distributes
a dividend or when the shareholder sells shares.

Congress treats American-controlled foreign corporations as pass-
through entities.  Subpart F of the Internal Revenue Code attributes
income of those business entities to American shareholders and taxes
those shareholders on that income.  §§951–952.  Subpart F, however,
applies only to a small portion of the foreign corporation's income,
mostly passive income.  In 2017, Congress passed the Tax Cuts and
Jobs Act.  As relevant here, Congress imposed a one-time, backward-
looking, pass-through tax on some American shareholders of
American-controlled foreign corporations to address the trillions of
dollars of undistributed income that had been accumulated by those
foreign corporations over the years.  Known as the Mandatory
Repatriation Tax, the tax imposed a rate from 8 to 15.5 percent on the
pro rata shares of American shareholders.  §§965(a)(1), (c), (d).

In this case, petitioners Charles and Kathleen Moore invested in the
American-controlled foreign corporation KisanKraft.  From 2006 to
2017, KisanKraft generated a great deal of income but did not
distribute that income to its American shareholders.  At the end of the
2017 tax year, application of the new MRT resulted in a tax bill of

Syllabus

$14,729 on the Moores' pro rata share of KisanKraft's accumulated income from 2006 to 2017. The Moores paid the tax and then sued for a refund, claiming, among other things, that the MRT violated the Direct Tax Clause of the Constitution because, in their view, the MRT was an unapportioned direct tax on their shares of KisanKraft stock. The District Court dismissed the suit, and the Ninth Circuit affirmed.

*Held*: The MRT—which attributes the realized and undistributed income of an American-controlled foreign corporation to the entity's American shareholders, and then taxes the American shareholders on their portions of that income—does not exceed Congress's constitutional authority. Pp. 5–24.

(a) Article I of the Constitution affords Congress broad power to lay and collect taxes. That power includes direct taxes—those imposed on persons or property—and indirect taxes—those imposed on activities or transactions. Direct taxes must be apportioned among the States according to each State's population, while indirect taxes are permitted without apportionment but must "be uniform throughout the United States," §8, cl. 1. Taxes on income are indirect taxes, and the Sixteenth Amendment confirms that taxes on income need not be apportioned. Pp. 5–7.

(b) The Government argues that the MRT is a tax on income and therefore need not be apportioned. The Moores contend that the MRT is a tax on property and that the tax is therefore unconstitutional because it is not apportioned. Income, the Moores argue, requires realization, and the MRT does not tax any income that they have realized. But the MRT *does* tax realized income—namely, the income realized by KisanKraft, which the MRT attributes to the shareholders. This Court's longstanding precedents, reflected in and reinforced by Congress's longstanding practice, confirms that Congress may attribute an entity's realized and undistributed income to the entity's shareholders or partners and then tax the shareholders or partners on their portions of that income. Pp. 8–16.

(1) The Court's longstanding precedents plainly establish that, when dealing with an entity's undistributed income, Congress may either tax the entity or tax its shareholders or partners. Whichever method Congress chooses, this Court has held that the tax remains a tax on income. In *Burk-Waggoner Oil Assn.* v. *Hopkins*, 269 U. S. 110, the Court held that the status of a business entity under state law could not limit Congress's power to tax a partnership's income as it chose, taxing either the partnership or the partners. *Id.*, at 114. The Court reiterated that principle in *Burnet* v. *Leininger*, 285 U. S. 136. Then, in *Heiner* v. *Mellon*, 304 U. S. 271, the Court reaffirmed that Congress may choose to tax either the partnership *or* the partners on the partnership's undistributed income, even where state law did not

Syllabus

allow the partners to personally receive the income. The principle articulated in *Heiner* also applies to corporations and their shareholders. *Helvering* v. *National Grocery Co.*, 304 U. S. 282. This line of precedents remains good law and establishes the clear principle that Congress can attribute the undistributed income of an entity to the entity's shareholders or partners and tax the shareholders or partners on their pro rata share of the entity's undistributed income. Notably, the principle has repeatedly been invoked by the lower courts in upholding subpart F.

The Moores' reliance on *Eisner* v. *Macomber*, 252 U. S. 189, which predates the *Heiner* and *Helvering* line of cases, is misplaced. There the question was whether a distribution of additional stock to all existing shareholders was taxable income. The Court said no, that income requires realization and that there was no change in the value of the shareholders' total stock holdings in the corporation before and after the stock distribution. The Court said separately in dicta that "what is called the stockholder's share in the accumulated profits of the company is capital, not income." 252 U. S., at 219. The Moores' interpret that language to mean that a tax attributing an entity's undistributed income to its shareholders or partners is not an income tax. The clear and definitive holdings in *Burk-Waggoner Oil*, *Heiner*, and *Helvering* render the Moores' reading of *Eisner* implausible. Those cases squarely addressed attribution and allowed it, whereas *Eisner* did not address attribution. Pp. 9–14.

(2) Congress's longstanding practice of taxing the shareholders or partners of a business entity on the entity's undistributed income reflects and reinforces the Court's precedents. For example, Congress passed an 1864 income-tax law that taxed shareholders or partners on "the gains and profits of all companies." 13 Stat. 282. In 1913, Congress enacted a new income tax that, among other things, taxed partners on their "share of the profits of a partnership." 38 Stat. 169. As new business entities arose, Congress employed a similar approach to S corporations, 26 U. S. C. §§1361–1362; American shareholders of foreign business entities, 50 Stat. 822; and American shareholders of American-controlled foreign corporations, 26 U. S. C. §§951, 952, 957. Pp. 14–16.

(c) The Moores attempt to distinguish the MRT from those taxes long imposed by Congress and long upheld by this Court and argue that only the MRT is unconstitutional. Their ad hoc distinctions do not undermine the clear rule established by this Court's precedents. First, the Moores argue that taxes on partnerships are distinguishable from the MRT and not controlled by precedent because partnerships are not separate entities from their partners. But that assertion is incorrect. When the Sixteenth Amendment was ratified, the courts,

Congress, and state legislatures treated partnerships as separate entities in many contexts, and numerous States imposed taxes directly on partnerships for partnership income.   The federal and state treatment of partnerships as separate legal entities for tax purposes contravenes the Moores' theory.  Second, the Moores argue that taxes on S corporations are distinguishable from the MRT because shareholders of S corporations choose to be taxed directly on corporation income.   But consent cannot explain Congress's authority to tax the shareholders of S corporations directly on corporate income. Rather, S corporations are another example of Congress's authority to either tax the corporation itself on corporate income or attribute the undistributed income to the shareholders and tax the shareholders. Third, the Moores try to distinguish Congress's long history of taxing shareholders of closely held foreign corporations—including through subpart F—on the ground that those laws apply "the doctrine of constructive realization."  That term seems to be a one-off label created by the Moores to allow them to sidestep any existing tax that does not comport with their proposed constitutional rule.   In any event, the Moores' constructive-realization theory does not distinguish the MRT from subpart F and other pass-through taxes.   For example, the Moores claim that constructive realization turns on a sufficent degree of control over the entity.  But the level of shareholder control with the MRT (at least 10 percent) is the same as under the longstanding subpart F tax.  And if, as the Moores concede, subpart F is not unconstitutional under the "constructive realization" theory, then the MRT is likewise not unconstitutional on that theory.  Pp. 16–22.

   (d) The Court's holding is narrow and limited to entities treated as pass-throughs.   Nothing in this opinion should be read to authorize any hypothetical congressional effort to tax both an entity and its shareholders or partners on the same undistributed income realized by the entity.   Nor does this decision attempt to resolve the parties' disagreement over whether realization is a constitutional requirement for an income tax.  Pp. 22–24.

36 F. 4th 930, affirmed.

   KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and JACKSON, JJ., joined. JACKSON, J., filed a concurring opinion.  BARRETT, J., filed an opinion concurring in the judgment, in which ALITO, J., joined.  THOMAS, J., filed a dissenting opinion, in which GORSUCH, J., joined.

Cite as: 602 U. S. ____ (2024)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 22–800

## CHARLES G. MOORE, ET UX., PETITIONERS
## *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 20, 2024]

JUSTICE KAVANAUGH delivered the opinion of the Court.

For tax purposes, Congress has long treated some corporations and partnerships as pass-throughs: Congress does not tax the entity on its income, but instead attributes the undistributed income of the entity to the shareholders or partners and then taxes the shareholders or partners on that income. This Court has long upheld those taxes.

Since 1962, Congress has likewise treated American-controlled foreign corporations as pass-throughs. That 1962 law (known as subpart F) attributes certain income, mostly passive income, of American-controlled foreign corporations to their American shareholders and then taxes those shareholders on that income.

In 2017, Congress enacted a new law that attributes more income, including active business income, of American-controlled foreign corporations to their American shareholders and then taxes those shareholders on that income. The question is whether that 2017 tax (known as the Mandatory Repatriation Tax or MRT) is constitutional under Article I, §§8 and 9 and the Sixteenth Amendment. This Court's longstanding precedents establish that the answer is yes.

Opinion of the Court

I

A

   In general, Congress taxes the income of American business entities such as corporations and partnerships in one of two ways.

   First, some entities such as S corporations and partnerships are taxed on a pass-through basis. (S corporations are corporations with 100 or fewer shareholders where the shareholders have elected to be taxed on a pass-through basis. 26 U. S. C. §§1361–1362.) Instead of the entity itself paying taxes, income is attributed to the entity's owners, such as shareholders or partners, who then pay taxes on the income of the entity even if the entity has not distributed any money or property to them. §§61(a)(12), 701, 1366(a)–(c).

   Second, other entities are taxed directly on their income. For example, some corporations file a return and pay taxes each year just like individual taxpayers. §11(a). When a corporation pays taxes on its income, its shareholders are ordinarily not taxed on that income. Instead, the shareholders typically pay taxes either when the corporation distributes money, stock, or other property to them as a dividend or when the shareholders sell their shares and have capital gains. §§61(a)(7), 1001. But the shareholders are not taxed on the corporate income itself.

   Congress has devised more nuanced rules for foreign entities such as foreign corporations. For legal and practical reasons, Congress generally does not directly tax foreign corporations, including American-controlled foreign corporations, on the income that they earn outside of the United States. Instead, Congress has imposed some taxes on income of those corporations on a pass-through basis.

   Most notably, starting in 1962, in what is known as subpart F of the Internal Revenue Code, Congress has treated American-controlled foreign corporations as pass-through entities:   Subpart F attributes income of the

Opinion of the Court

corporation to American shareholders, and taxes those American shareholders on that income. 26 U. S. C. §§951–952. But subpart F applies only to a small portion of the foreign corporation's income, mostly passive income.

In 2017, Congress passed and President Trump signed the Tax Cuts and Jobs Act. 131 Stat. 2054. In a variety of ways not relevant to this case, the Act altered the United States' approach to international corporate taxation. The primary goal was to encourage Americans who controlled foreign corporations to invest earnings from their foreign investments back in the United States instead of abroad.

As relevant here, one piece of that intricate and multi-faceted 2017 Act imposed a new, one-time pass-through tax on some American shareholders of American-controlled foreign corporations. That one-time tax addressed one of the problems that had arisen under the old system:  For decades before the 2017 Act, American-controlled foreign corporations had earned and accumulated trillions of dollars in income abroad that went almost entirely untaxed by the United States. The foreign corporations themselves were not taxed on their income. And other than subpart F, which applies mostly to passive income, the undistributed income of those foreign corporations was not attributed to American shareholders for the shareholders to be taxed.

As part of the complicated transition to a more territorial system, the 2017 Act imposed a one-time, backward-looking tax on that accumulated income. That backward-looking tax is known as the Mandatory Repatriation Tax or MRT. §965. Similar in structure to subpart F, the MRT attributed the long-accumulated and undistributed income of American-controlled foreign corporations to American shareholders, and then taxed those American shareholders on their pro rata shares of that long-accumulated income at a rate from 8 to 15.5 percent. §§965(a), (c), (d).[1]

_____

[1] The Act also imposed a similar pass-through tax going forward.

B

In 2006, Charles and Kathleen Moore invested $40,000 in an American-controlled foreign corporation that one of their friends had started in India. In return, the Moores received a 13-percent ownership share. The company, KisanKraft, generated a great deal of income. But as of 2017, KisanKraft had not distributed that income to its American shareholders, including the Moores, meaning that neither KisanKraft nor the Moores had paid U. S. taxes on that income.

The MRT applied to the Moores because of their investment in KisanKraft. By the end of the 2017 tax year, the Moores' pro rata share of KisanKraft's accumulated income from 2006 to 2017 totaled about $508,000. After factoring in a deduction that is not relevant here, the Moores declared $132,512 in income under the MRT based on their KisanKraft shares. They owed $14,729 in taxes on that income.

The Moores paid that amount, then sued for a refund. They claimed that the MRT was unconstitutional for two reasons. First, they argued that the MRT violated the Direct Tax Clause of the Constitution because, in their view, the MRT was an unapportioned direct tax on their shares of KisanKraft stock. Second, they contended that the MRT violated the Due Process Clause of the Fifth Amendment because it applied retroactively to past income.

The District Court dismissed the suit, and the U. S. Court of Appeals for the Ninth Circuit affirmed. The Court of Appeals held that the MRT constitutes a tax on income within the meaning of the Constitution because "KisanKraft earned significant income, and the MRT assigns only a pro-rata share of that income to the Moores." 36 F. 4th 930, 936–937 (2022). The Court of Appeals also

_____

§951A. That tax applies to what is referred to as "global intangible low-taxed income." §951A(a). That tax is not at issue in this case.

Opinion of the Court

rejected the Moores' due process claim regarding retroactivity. *Id.*, at 938–939.

The Moores sought review in this Court, raising only their Direct Tax Clause argument. This Court granted certiorari. 599 U. S. ___ (2023).

II

We must decide whether the 2017 Mandatory Repatriation Tax, or MRT, exceeds Congress's constitutional authority. To analyze that question, we begin with a brief review of Congress's taxing power under the Constitution.

After Independence in 1776 and under the Articles of Confederation in effect from 1781 to 1789, the Federal Government relied primarily on contributions from the States for revenue. The Federal Government's expenses and needs sometimes far outpaced the contributions that the States were willing to provide. As George Washington famously recognized during the Revolutionary War, reliance on the States to fund the National Government hampered important national priorities—including the war against the British. 12 Papers of George Washington: Revolutionary War Series 683–687 (P. Chase & F. Grizzard eds. 2002) (letter from Valley Forge).

The National Government's continuing revenue problems under the Articles of Confederation helped prompt the Constitutional Convention that convened in Philadelphia in the summer of 1787. The Federalist No. 30 (A. Hamilton). The Framers responded to the revenue problem by granting Congress an expansive taxing power.

Article I of the Constitution affords Congress broad "Power To lay and collect Taxes, Duties, Imposts and Excises." Art. I, §8, cl. 1. That power includes "'two great classes of'" taxes—direct taxes and indirect taxes. *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 13 (1916).

Generally speaking, *direct* taxes are those taxes imposed

on persons or property.  See *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 570–571 (2012).  As a practical matter, however, Congress has rarely enacted direct taxes because the Constitution requires that direct taxes be apportioned among the States.  To be apportioned, direct taxes must be imposed "in Proportion to the Census of Enumeration."  U. S. Const., Art. I, §9, cl. 4; see also §2, cl. 3.  In other words, direct taxes must be apportioned among the States according to each State's population.

So if Congress imposed a property tax on every American homeowner, the citizens of a State with five percent of the population would pay five percent of the total property tax, even if the value of their combined property added up to only three percent of the total value of homes in the United States.  To pay five percent, the tax rate on the citizens of that State would need to be substantially higher than the tax rate in a neighboring State with the same population but more valuable homes.

To state the obvious, that kind of complicated and politically unpalatable result has made direct taxes difficult to enact.  Indeed, the parties have cited no apportioned direct taxes in the current Internal Revenue Code, and it appears that Congress has not enacted an apportioned tax since the Civil War.  See 12 Stat. 297; E. Jensen, The Taxing Power: A Reference Guide to the United States Constitution 89 (2005).

By contrast, *indirect* taxes are the familiar federal taxes imposed on activities or transactions.  That category of taxes includes duties, imposts, and excise taxes, as well as income taxes. U. S. Const., Art. I, §8, cl. 1; Amdt. 16.  Under the Constitution, indirect taxes must "be uniform throughout the United States."  Art. I, §8, cl. 1.  A "'tax is uniform when it operates with the same force and effect in every place where the subject of it is found.'"  *United States* v. *Ptasynski*, 462 U. S. 74, 82 (1983).

Opinion of the Court

Because income taxes are indirect taxes, they are permitted under Article I, §8 without apportionment. As this Court has said, Article I, §8's grant of taxing power "is exhaustive," meaning that it could "never" reasonably be "questioned from the" Founding that it included the power "to lay and collect income taxes." *Brushaber*, 240 U. S., at 12–13.    In 1861, Congress enacted the Nation's first unapportioned income tax. 12 Stat. 309. The Civil War income tax was recognized as an indirect tax "under the head of excises, duties and imposts." *Brushaber*, 240 U. S., at 15; see also *Springer* v. *United States*, 102 U. S. 586, 598, 602 (1881).

In 1895, however, in *Pollock* v. *Farmers' Loan & Trust Co.*, this Court held that a tax on income from property equated to a tax on the property itself, and thus was a direct tax that had to be apportioned among the States. 158 U. S. 601, 627–628.  The *Pollock* decision sparked significant confusion and controversy throughout the United States.

Congress and the States responded to *Pollock* by approving a new constitutional amendment.  Ratified in 1913, the Sixteenth Amendment rejected *Pollock*'s conflation of (i) income from property and (ii) the property itself.  The Amendment provides: "The Congress shall have power to lay and collect taxes on incomes, *from whatever source derived*, without apportionment among the several States, and without regard to any census or enumeration." U. S. Const., Amdt. 16 (emphasis added).

Therefore, the Sixteenth Amendment expressly confirmed what had been the understanding of the Constitution before *Pollock*: Taxes on income—including taxes on income from property—are indirect taxes that need not be apportioned. *Brushaber*, 240 U. S., at 15, 18. Meanwhile, property taxes remain direct taxes that must be apportioned. See *Helvering* v. *Independent Life Ins. Co.*, 292 U. S. 371, 378–379 (1934).

Opinion of the Court

### III

With that background, we turn to the 2017 Mandatory Repatriation Tax. The MRT is not apportioned among the States. The Government argues that the MRT is a tax on income and therefore need not be apportioned. The Moores contend that the MRT is a tax on property, rather than a tax on income, and that the tax is therefore unconstitutional because it is not apportioned.

What distinguishes income from property? The Moores argue that income requires realization. The Moores say that realization occurs when gains come into the taxpayer's coffers—for example, through wages, sales, or dividends, as distinct from appreciation in the value of a home, stock investment, or other property. And the Moores contend that the MRT does not tax any income that they have realized.

Critically, however, the MRT *does* tax realized income—namely, income realized by the corporation, KisanKraft. The MRT attributes the income of the corporation to the shareholders, and then taxes the shareholders (including the Moores) on their share of that undistributed corporate income.

So the precise and narrow question that the Court addresses today is whether Congress may attribute an entity's realized and undistributed income to the entity's shareholders or partners, and then tax the shareholders or partners on their portions of that income. This Court's longstanding precedents, reflected in and reinforced by Congress's longstanding practice, establish that the answer is yes.[2]

---

[2] As discussed below, *infra*, at 22–24, our analysis today does not address the distinct issues that would be raised by (i) an attempt by Congress to tax both the entity and the shareholders or partners on the entity's undistributed income; (ii) taxes on holdings, wealth, or net worth; or (iii) taxes on appreciation.

A

Congress sometimes chooses to tax a business entity itself on the income that the entity earns.  Alternatively, Congress sometimes elects to treat an entity as a pass-through—attributing the entity's undistributed income to the shareholders or partners and then taxing the shareholders or partners on that income.  Either way, this Court has held that the tax remains a tax on income—and thus an indirect tax that need not be apportioned.

In 1925, in *Burk-Waggoner Oil Assn.* v. *Hopkins*, the Court articulated that fundamental principle.  269 U. S. 110.  The case involved a tax on the income of an entity that state law treated as a partnership.  Under state law, the partnership's property was considered the property of the partners.  For that reason, the partnership argued that Congress had to tax the partners on the income and could not tax the partnership.

This Court rejected that argument.  The Court stated: "Neither the conception of unincorporated associations prevailing under the local law, nor the relation under that law of the association to its shareholders, nor their relation to each other and to outsiders, is of legal significance as bearing upon the power of Congress to determine how and at what rate the income of the joint enterprise shall be taxed." *Id.*, at 114.  In other words, Congress could tax the income as it chose, taxing either the partnership or the partners on the partnership's undistributed income.  So the tax on the partnership was proper.

In 1932, in *Burnet* v. *Leininger*, the Court reiterated that principle. 285 U. S. 136.  There, the Court considered "the validity" of a tax attributing partnership income to partners. *Id.*, at 142.  The Court again held that "Congress, having the authority to tax the net income of partnerships, could impose the liability upon the partnership directly," or it could impose tax liability "upon the individuals carrying on business in partnership."  *Ibid.* (quotation marks

omitted).

Next, in 1938 in *Heiner* v. *Mellon*, the Court again addressed a situation closely akin to the Moores' case here—a tax on partners for the undistributed income of their partnership. 304 U. S. 271. In that case, the partnership earned income, but state law did not allow the partners to personally receive the income. Nonetheless, under the relevant federal tax law, the individual partners owed taxes on the partnership's income. The partners argued that Congress could not tax them on income that they did not and could not personally receive.

This Court upheld the tax on the partners, reasoning that it was immaterial that the partners did not actually receive the income earned by the partnership. The Court reaffirmed that Congress may choose to tax either the partnership *or* the partners on the partnership's undistributed income.

The principle articulated by this Court in *Heiner* v. *Mellon* also applies to corporations and their shareholders. On the same day in 1938 that the Court decided *Heiner* v. *Mellon*, the Court also decided *Helvering* v. *National Grocery Co.* In that case, the Court ruled that the controlling shareholder of a corporation could not "prevent Congress, if it chose to do so, from laying on him individually the tax on the year's profits." 304 U. S. 282, 288. Citing *Heiner* v. *Mellon*, the Court stated that Congress may tax shareholders of the corporation on the corporation's undistributed income, in much the same way that Congress can tax the partners of a partnership on the partnership's undistributed income. 304 U. S., at 288–289.

So by 1938, this Court's precedents had established a clear rule that directly contradicts the Moores' argument in this case. That line of precedent remains good law to this day. Indeed, since then, it has gone without serious question in both Congress and the federal courts that Congress can attribute the undistributed income of an

Opinion of the Court

entity to the entity's shareholders or partners, and tax the shareholders or partners on their pro rata share of the entity's undistributed income.

Most notably, the courts have repeatedly invoked that principle in upholding subpart F, which Congress enacted in 1962. Like the MRT, subpart F treats certain foreign corporations as pass-throughs by attributing undistributed income of foreign corporations to their American shareholders, and then taxing the American shareholders on their pro rata shares of the income. As the Second Circuit concluded in a leading case upholding subpart F: The constitutional challenge to subpart F "borders on the frivolous" in light of *Heiner* v. *Mellon*. *Garlock, Inc.* v. *Commissioner*, 489 F. 2d 197, 202–203, and n. 5 (1973); see also *Estate of Whitlock* v. *Commissioner*, 59 T. C. 490, 507 (1972) (The "Supreme Court's pronouncements have been to the effect that taxation of undistributed current corporate income at the stockholder level rather than at the corporate level is within the congressional power"), aff'd in relevant part, 494 F. 2d 1297, 1301 (CA10 1974) (adopting the Tax Court's analysis); B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts ¶1.2.4 (2024) (noting the consensus in favor of Congress's power to tax foreign corporations as pass-through businesses); cf. *Eder* v. *Commissioner*, 138 F. 2d 27, 28 (CA2 1943) ("In a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability").

In response to that dispositive line of precedents against them, the Moores invoke the Court's earlier 1920 decision in *Eisner* v. *Macomber*, 252 U. S. 189. The Moores argue that some language in *Eisner* v. *Macomber* is inconsistent with the rule subsequently established in *Burk-Waggoner Oil Assn.* v. *Hopkins*, *Heiner* v. *Mellon*, and *Helvering* v. *National Grocery Co.* and followed ever since by Congress

and the federal courts.

The Moores' reliance on *Eisner* v. *Macomber* with respect to the attribution issue is misplaced. Importantly, *Eisner* v. *Macomber* was *not* a case about Congress's power to attribute the income of an entity to the entity's shareholders or partners. Rather, the Court in *Eisner* v. *Macomber* addressed a situation where a corporation created and distributed additional stock to existing shareholders. 252 U. S., at 200. The corporation distributed the additional shares of stock in proportion to each shareholder's percentage of ownership. *Id.*, at 210–211. So the actual value of the shareholders' total stock holdings in the corporation did not change. *Ibid.*

The question in *Eisner* v. *Macomber* was whether the new stock was nonetheless taxable income for the shareholders. *Id.*, at 199. The Court said no. *Id.*, at 212. The Court reasoned that there was no change in the value of the shareholders' total stock holdings in the corporation before and after the stock distribution. *Id.*, at 210–211. So the new stock did not represent any kind of economic gain to the shareholders. *Ibid.* And the Court further stated that income requires realization. *Id.*, at 207, 211–212. Yet neither the corporation nor the shareholders had realized income from the corporation's creation and distribution of additional stock. *Id.*, at 210–213.[3]

_____

[3] The Government argues that a gain does not need to be realized to constitute income under the Constitution. The Government contends that *Eisner* v. *Macomber*'s discussion of realization was dicta because the stock dividend did not represent any kind of economic gain (realized *or* unrealized) for the shareholders. The Government further contends that *Eisner* v. *Macomber*'s discussion of realization has, in any event, been abrogated by later decisions of this Court, such as *Helvering* v. *Bruun*, 309 U. S. 461 (1940), *Helvering* v. *Griffiths*, 318 U. S. 371 (1943), and *Commissioner* v. *Glenshaw Glass Co.*, 348 U. S. 426 (1955). Because the MRT taxes realized income—namely, income realized by the corporation and attributed to the shareholders—we do not address the Government's argument that a gain need not be realized to constitute income under the

Cite as: 602 U. S. ____ (2024)          13

Opinion of the Court

Separate from that analysis, the Court went on to say in dicta that "what is called the stockholder's share in the accumulated profits of the company is capital, not income." *Id.*, at 219. Because the corporation had already paid taxes on its income, that statement and the surrounding discussion may have been designed to cast doubt on the legality of double taxation—taxing both the corporation and its shareholders on the corporation's undistributed income. See, *e.g.*, Brief for American College of Tax Counsel as *Amicus Curiae* 16–17; Brief for Tax Law Center at NYU Law et al. as *Amici Curiae* 6–7.

But the Moores interpret that language in *Eisner* v. *Macomber* to mean that a tax attributing an entity's undistributed income to its shareholders or partners is not an income tax. The Moores' reading is implausible. The Court in *Eisner* v. *Macomber* did not purport to address attribution, no doubt because the tax at issue there did not attribute income of the corporation to the shareholders. And if there were any ambiguity on that point, it was quickly eliminated by this Court's clear and definitive holdings in *Burk-Waggoner Oil Assn.* v. *Hopkins*, *Heiner* v. *Mellon*, and *Helvering* v. *National Grocery Co.* In those three cases, unlike in *Eisner* v. *Macomber*, the Court squarely addressed attribution—and allowed it. None of those cases so much as mentioned *Eisner* v. *Macomber*, which is not surprising because, to reiterate, *Eisner* v. *Macomber* did not address attribution. So whatever else *Eisner* v. *Macomber* might stand for, it does not proscribe attribution and thus has no bearing on the attribution issue in this case.

To sum up: The Court's longstanding precedents plainly establish that, when dealing with an entity's undistributed income, Congress may tax either (i) the entity or (ii) its

Constitution. See also *infra*, at 22–24.

Opinion of the Court

shareholders or partners.[4]

B

Consistent with this Court's case law, Congress has long taxed the shareholders and partners of business entities on the entities' undistributed income. That longstanding congressional practice reflects and reinforces this Court's precedents upholding those kinds of taxes.

In 1864, for example, Congress passed and President Lincoln signed an income-tax law that taxed individuals on "the gains and profits of all companies, whether incorporated or partnership," in which they were shareholders or partners. 13 Stat. 282. In 1871, the Court upheld the constitutionality of that tax. *Collector* v. *Hubbard*, 12 Wall. 1, 18.[5]

In 1913, soon after the Sixteenth Amendment was ratified, Congress enacted a new income tax on shareholders for their share of the incomes of corporations formed or used to evade taxes. 38 Stat. 166. That 1913 law also taxed partners on each partner's "share of the profits of a partnership." *Id.*, at 169. As explained above, the Court upheld that approach to partnership taxation in *Burnet* v. *Leininger*, 285 U. S., at 142, and *Heiner* v. *Mellon*, 304 U. S., at 280. Ever since that 1913 law and those cases, the basic partnership-tax rule has been settled: It "is axiomatic that each partner must pay taxes on his

---

[4] The Government acknowledges that there are due process limits on attribution to ensure that the attribution is not arbitrary—for example, limits based on the taxpayer's relationship to the underlying income. Tr. of Oral Arg. 66–67, 96–97; see also *Burnet* v. *Wells*, 289 U. S. 670, 678–679 (1933). In this Court, the Moores have not raised a due process issue regarding the attribution of KisanKraft's income to them.

[5] This Court's 1895 decision in *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, later proscribed unapportioned federal taxation of income from property, and therefore overruled that holding of *Hubbard*. See *supra*, at 7. But in 1913, the Sixteenth Amendment then overruled that aspect of *Pollock*.

Opinion of the Court

distributive share of the partnership's income without regard to whether that amount is actually distributed to him." *United States* v. *Basye*, 410 U. S. 441, 453 (1973).

As new kinds of corporate entities arose, Congress employed a similar approach. For example, in the 1918 Revenue Act, Congress decided to tax shareholders of personal service corporations—that is, shareholders of closely held corporations that earn most of their income from the work of their principal owners and shareholders— "in the same manner as the members of partnerships." 40 Stat. 1070.

And since 1958, the Internal Revenue Code has also taxed the shareholders of S corporations in the same way as partnerships—by taxing the shareholders on their share of the undistributed income of the corporation. See *Bufferd* v. *Commissioner*, 506 U. S. 523, 524–525 (1993). S corporations are corporations with 100 or fewer shareholders where the shareholders have elected to be taxed directly on the corporate income. 26 U. S. C. §§1361– 1362. A majority of the corporations in the United States are S corporations, so the taxation of individual shareholders of S corporations is widespread.

In addition, Congress has long taxed major American shareholders of *foreign* business entities on some of the income of those entities. For example, in 1937, Congress taxed American shareholders of foreign personal holding companies on those companies' undistributed income. 50 Stat. 822.

And in 1962, Congress enacted subpart F, which remains in place to this day. 76 Stat. 1006, 26 U. S. C. §951 *et seq*. To reiterate, subpart F taxes American shareholders of American-controlled foreign corporations on several kinds of undistributed corporate income, mostly passive income. §§951, 952, 957. And as noted above, in light of this Court's precedents, the Courts of Appeals have uniformly rejected constitutional challenges to subpart F. See *Garlock*, 489

F. 2d, at 202–203, and n. 5 (the constitutional challenge to subpart F "borders on the frivolous" in light of *Heiner* v. *Mellon*); *Estate of Whitlock*, 494 F. 2d, at 1301.

In short, before and after ratification of the Sixteenth Amendment, Congress has often taxed the shareholders or partners of a business entity on the entity's undistributed income. Such a "[l]ong settled and established practice" can carry "great weight in" resolving constitutional questions—and here it reflects and reinforces this Court's precedents. *Chiafalo* v. *Washington*, 591 U. S. 578, 592 (2020) (quotation marks omitted); see also *Moore* v. *Harper*, 600 U. S. 1, 32 (2023) (The Court has "long looked to 'settled and established practice' to interpret the Constitution" (quoting *The Pocket Veto Case*, 279 U. S. 655, 689 (1929))); *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 678 (1970) (An "unbroken practice . . . is not something to be lightly cast aside"); The Federalist No. 37, p. 229 (C. Rossiter ed. 1961) (J. Madison).

## IV

The Moores are obviously aware of those longstanding congressional practices and Supreme Court precedents, so they had two choices of how to deal with that stark reality in this Court. They could have argued that all of those taxes are unconstitutional and that all of those precedents should be overruled. Or in an effort to contain the blast radius of their legal theory, they could have tried to distinguish the MRT from those other taxes and argue that only the MRT is unconstitutional. They chose the latter approach.

To be specific: The Moores explicitly concede that partnership taxes, S-corporation taxes, and subpart F taxes are income taxes that are constitutional and need not be apportioned. Tr. of Oral Arg. 9, 48; Brief for Petitioners 50–51. The Moores likewise do not ask the Court to overrule any of the precedents that we have discussed above, which upheld the attribution of entities' undistributed income.

Opinion of the Court

*Id.,* at 49–52.

Instead, the Moores seek to differentiate the MRT from all of those other taxes long imposed by Congress and long upheld by this Court. The Moores have advanced an array of ad hoc distinctions to try to explain why those longstanding taxes are constitutional and why those precedents are correct, and to simultaneously try to explain why those taxes and precedents do not eviscerate their argument that the MRT is unconstitutional. But the Moores' effort to thread that needle, although inventive, is unavailing.

According to the Moores: (1) taxes on partnerships are distinguishable from the MRT and not controlled by precedent because partnerships are not separate entities from their partners; (2) taxes on S corporations are distinguishable from the MRT and not controlled by precedent because shareholders of S corporations choose to be taxed directly on corporate income; and (3) subpart F taxes on American shareholders' portions of undistributed foreign corporate income are distinguishable from the MRT and not controlled by precedent because those taxes apply what the Moores call "constructive realization."

To begin, and perhaps most importantly, the Moores' set of ad hoc distinctions does not undermine the clear rule established by this Court's precedents: Congress can choose either to tax the entity on its income or to tax the entity's shareholders or partners on their share of the entity's undistributed income. *Burk-Waggoner Oil Assn.* v. *Hopkins,* 269 U. S. 110, 114 (1925).

In any event, the Moores' attempted distinctions of the various taxes fail on their own terms.

*First,* the Moores contend that partners can be taxed on a partnership's income only because, as of the time that the Sixteenth Amendment was ratified in 1913, partnerships were not seen as legal entities separate from the partners. But that assertion is incorrect. When the Sixteenth

Opinion of the Court

Amendment was ratified, the courts, Congress, and state legislatures treated partnerships as separate entities in many contexts. See, *e.g.*, *Forsyth* v. *Woods*, 11 Wall. 484, 486 (1871) ("The partnership is a distinct thing from the partners themselves . . ."); W. Cowles, The Firm as a Legal Person, 57 Central L. J. 343 (1903) (citing many additional ratification-era cases); see also H. Black, Law of Income Taxation Under Federal and State Laws 100 (1913) (The "undivided earnings of a partnership . . . properly constitute income of the firm but not of the individual partners"); 30 Stat. 545, 547–548 (1898) (federal bankruptcy law that treated partnerships as separate entities); F. Burdick, Law of Partnership, ch. 3, §1, pp. 85–86 (rev. 2d ed. 1906) (It "is becoming more and more customary for legislation and judicial decisions to treat a partnership as an entity").

During the time period around ratification of the Sixteenth Amendment, moreover, numerous States imposed taxes directly on partnerships for partnership income. 1 S. Rowley, The Modern Law of Partnership §306 (1916); 2 *id.*, §935, at 1295, and n. 1 (collecting 21 state laws); Black 146. And during World War I, Congress enacted the Revenue Act of 1917, which also imposed a tax directly on partnerships. 40 Stat. 303. The federal and state treatment of partnerships as separate legal entities for tax purposes contravenes the Moores' theory that pass-through taxation is inherent in the nature of partnerships rather than a legislative choice.

In short, the Moores are incorrect to claim that partnerships were not historically seen as separate taxable entities.

To be sure, courts declined to recognize partnerships as separate entities in certain common-law contexts. 1 Rowley §118; Burdick, ch. 3, §1. But those cases simply demonstrate that partnerships were (and are) flexible entities that can receive flexible legal treatment. Those

cases are consistent with the longstanding principle recognized by this Court that "Congress, having the authority to tax the net income of partnerships, could impose the liability upon the partnership directly, as it did under the Revenue Act of 1917, or upon the 'individuals carrying on business in partnership.'" *Burnet* v. *Leininger*, 285 U. S. 136, 142 (1932) (citation omitted).  As with other business entities, Congress may choose whether to tax (i) the entity or (ii) its shareholders or partners on the entity's undistributed income.

*Second*, the Moores seek to distinguish the taxation of S corporations by saying that shareholders' choice to become an S corporation necessarily means that the S corporation's income is truly the shareholders' income.  But consent cannot explain S-corporation taxation; after all, consent to taxation as an S corporation can be revoked only if shareholders who hold a majority of the corporation's shares agree.  26 U. S. C. §1362(d)(1)(B).  So, for example, if shareholders who hold 49 percent of the shares no longer consent to paying taxes on undistributed earnings, they nonetheless still must do so.  Moreover, there is no reason to think that shareholder consent can eliminate the apportionment requirement (which is a structural requirement of the Constitution) and allow Congress to enact an otherwise unconstitutional tax.

In short, the Moores' consent theory does not explain Congress's authority to tax the shareholders of S corporations directly on corporate income.   Rather, S corporations are another example of Congress's authority to either tax the corporation itself on corporate income or attribute the undistributed income to the shareholders and tax the shareholders.

*Third*, the Moores try to distinguish Congress's long history of taxing shareholders of closely held foreign corporations—including through subpart F—on the ground that those laws apply "the doctrine of constructive

Opinion of the Court

realization." Brief for Petitioners 47.

The Moores have not pointed to any use of the phrase "constructive realization" in this Court's case law or the Internal Revenue Code. Instead, the term seems to be a one-off label woven out of whole cloth by the Moores to allow them to sidestep any existing tax, especially subpart F, that does not accord with their proposed constitutional rule. See Brief for American Tax Policy Institute as *Amicus Curiae* 28 (noting that "'constructive realization' actually is a new, amorphous phrase of petitioners' devising").

In any event, whatever its label, the Moores' constructive-realization theory does not distinguish the MRT from subpart F and other pass-through taxes. For example, the Moores claim that constructive realization turns on a sufficient degree of control over the entity. But the level of shareholder control with the MRT (at least 10 percent) is the same as under the longstanding subpart F tax. (And control provides an even less persuasive distinction for partners and for shareholders of S corporations, who may have even less than a 10 percent share and still have the entity's income attributed to them.)

As part of their effort to distinguish the MRT from subpart F, the Moores also argue that subpart F is limited to taxing "'movable income'" that may have been shifted abroad to avoid taxes. Brief for Petitioners 45. But that is not accurate. Subpart F also includes income from doing business in a country under certain sanctions. §952(a)(5). Moreover, like subpart F, the MRT responds to concerns that the owners of American-controlled foreign corporations keep money offshore to defer taxation. So it is not clear why the MRT would not also satisfy the Moores' requirement of an anti-tax-avoidance purpose.

Therefore, even if we were to accept the Moores' constructive-realization nomenclature and theory, the Moores' concession that subpart F imposes taxes on so-called constructively realized income would necessarily

Opinion of the Court

mean that the MRT likewise imposes taxes on constructively realized income. After all, the MRT is integrated into subpart F's framework, and it has the same essential features as subpart F. If subpart F is not unconstitutional under the "constructive realization" theory—and the Moores explicitly concede that it is not, Tr. of Oral Arg. 9—then the MRT is likewise not unconstitutional on that theory.

In short, the Moores cannot meaningfully distinguish the MRT from similar taxes such as taxes on partnerships, on S corporations, and on subpart F income.[6] The upshot is that the Moores' argument, taken to its logical conclusion, could render vast swaths of the Internal Revenue Code unconstitutional. See, *e.g.*, 26 U. S. C. §305(c) (deemed stock distributions); §§446, 448 (accrual accounting); §701 (partnership taxation); §§951–965 (subpart F); §951A (pass-through tax on global intangible low-taxed income); §1256(a) (certain futures contracts); §1272(a) (original-issue discount instruments); §§1361–1379 (S corporations); §§2501–2524 (gift taxes).

And those tax provisions, if suddenly eliminated, would deprive the U. S. Government and the American people of trillions in lost tax revenue. The logical implications of the Moores' theory would therefore require Congress to either drastically cut critical national programs or significantly increase taxes on the remaining sources available to it—including, of course, on ordinary Americans. The

---

[6] The MRT applies to income that was realized and accumulated in the past by foreign corporations, but not taxed by the United States. In the lower courts, the Moores raised a due process retroactivity argument—that the MRT taxes income that was earned too far in the past. The Ninth Circuit rejected that argument based on this Court's decision in *United States* v. *Carlton*, 512 U. S. 26, 30 (1994). And the Moores did not seek certiorari on that issue. "We do not normally consider a separate legal question not raised in the certiorari briefs," and "see no reason to make an exception here." *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 563 U. S. 1, 17 (2011); see also this Court's Rule 14.1(a).

Constitution does not require that fiscal calamity.[7]

\*      \*      \*

The MRT attributes the undistributed income of American-controlled foreign corporations to their American shareholders, and then taxes the American shareholders on that income. By doing so, the MRT operates in the same basic way as Congress's longstanding taxation of partnerships, S corporations, and subpart F income. And the MRT is consistent with the principles that this Court articulated in upholding those kinds of taxes in cases such as *Burk-Waggoner Oil Assn.* v. *Hopkins*, *Heiner* v. *Mellon*, and *Helvering* v. *National Grocery Co.* The MRT therefore falls squarely within Congress's constitutional authority to tax.

For their part, the dissent and the opinion concurring in the judgment focus primarily on the realization issue—namely, whether realization is required for an income tax. We do not decide that question today. When they reach the attribution question that we do decide, the separate opinions disagree with our reading of some of the Court's precedents. We respect their views. But as we thoroughly explained above, we read the Court's precedents differently.

That said, we emphasize that our holding today is narrow. It is limited to: (i) taxation of the shareholders of an entity, (ii) on the undistributed income realized by the entity, (iii) which has been attributed to the shareholders,

---

[7] According to the Moores, because the Internal Revenue Code's "definition of 'gross income' exerts the full measure of Congress's taxing power," a ruling against them would instantly subject all American stockholders to taxes on corporate income. Tr. of Oral Arg. 4–5. That claim is entirely incorrect. Congress has chosen to directly tax some corporations on their income. See 26 U. S. C. §11. Congress's choice to tax the entity rather than the shareholders controls in that context, just as its contrary choice to tax certain shareholders or partners, not the entity, on the entity's undistributed income controls for the MRT, partnerships, S corporations, and subpart F.

Opinion of the Court

(iv) when the entity itself has not been taxed on that income.  In other words, our holding applies when Congress treats the entity as a pass-through.[8]

To be clear, as we indicated earlier, the Due Process Clause proscribes arbitrary attribution.  See *supra*, at 14, n. 4.  And nothing in this opinion should be read to authorize any hypothetical congressional effort to tax both an entity and its shareholders or partners on the same undistributed income realized by the entity.  In such a scenario, the entity would not simply be a traditional pass-through.[9]

In addition, as the Government explains, other kinds of taxes could of course raise different issues.  See Tr. of Oral Arg. 58–59, 62, 127–128.  In its brief and at oral argument, for example, the Government indicated that a hypothetical unapportioned tax on an individual's holdings or property (for example, on one's wealth or net worth) might be considered a tax on property, not income.  See Brief for United States 19 (distinguishing an income tax from a tax on wealth or net worth because "an income tax targets economic gain 'between two points of time'"); Tr. of Oral Arg. 69, 127–128.

And the Government further acknowledges that the constitutionality of a hypothetical unapportioned tax on appreciation may depend on, among other things, whether realization is a constitutional requirement for an income tax.  See *id.*, at 58–59, 62, 70, 93–95, 106–108, 126–127; see

───────

[8] The opinion concurring in the judgment reads the Court's attribution precedents to draw a line that might call for a "different" conclusion for "a tax on shareholders of a widely held or domestic corporation." *Post*, at 1 (opinion of BARRETT, J.).  We do not agree that the Court's precedents draw such a line.  Nor does our opinion today draw such a line.

[9] That issue is distinct from Congress's well-established practice of taxing the corporation on corporate income and then taxing shareholders when they receive a dividend.  See *Hellmich* v. *Hellman*, 276 U. S. 233, 237–238 (1928); see also *United States* v. *Hemme*, 476 U. S. 558, 572 (1986).

Opinion of the Court

also Brief for United States 32. The Moores argue that realization is a constitutional requirement; the Government argues that it is not. To decide this case, we need not resolve that disagreement over realization.

Those are potential issues for another day, and we do not address or resolve any of those issues here. As to the Moores' case, Congress has long taxed shareholders of an entity on the entity's undistributed income, and it did the same with the MRT. This Court has long upheld taxes of that kind, and we do the same today with the MRT. We affirm the judgment of the U. S. Court of Appeals for the Ninth Circuit.

*It is so ordered.*

Cite as: 602 U. S. ____ (2024)

1

JACKSON, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

No. 22–800

———————

## CHARLES G. MOORE, ET UX., PETITIONERS
### *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 20, 2024]

JUSTICE JACKSON, concurring.

Our Constitution grants Congress "plenary power" over taxation. *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 13 (1916). The text supplies only two relevant conditions: Direct taxes must be apportioned among the States based on population, see Art. I, §9; all other taxes must "be uniform throughout the United States," §8. During the century after our Nation's founding, the Court repeatedly recognized that, in matters of tax policy, Congress's view was controlling. See, *e.g.*, *Pacific Ins. Co.* v. *Soule*, 7 Wall. 433, 443 (1869) ("Where the power of taxation, exercised by Congress, is warranted by the Constitution . . . it is, necessarily, unlimited in its nature"); *Collector* v. *Hubbard*, 12 Wall. 1, 18 (1871) (upholding a tax on undistributed corporate earnings because "it is as competent for Congress to tax annual gains and profits before they are divided among the holders of the stock as afterwards").

Then came *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601 (1895). In that case, the Court invalidated a federal income tax, holding that a tax on income derived from property was a direct tax requiring apportionment. See *id.*, at 637. *Pollock* provoked immediate outcry. President Taft, later Chief Justice of this Court, said, "'Nothing has ever injured the prestige of the Supreme Court more.'" B. Ackerman, Taxation and the Constitution, 99 Colum. L. Rev. 1, 5

(1999). In 1913, the People's representatives responded, using their power to overturn *Pollock* via constitutional amendment. The Sixteenth Amendment restored to Congress the power to tax "incomes, from whatever source derived, without apportionment."

Against that stark backdrop, the Court wisely takes a restrained approach today. Petitioners allege that the Mandatory Repatriation Tax (MRT) exceeded Congress's power by taxing shareholders on the undistributed income of a corporation; such a tax, petitioners argue, is really a direct tax requiring apportionment. The majority opinion rightly rejects that challenge, thoroughly explaining why the MRT falls within Congress's long-recognized, oft-exercised power to tax shareholders on the undistributed income of a business entity. See *ante,* at 22. I write separately to emphasize that, before taking up petitioners' invitation to strike down a lawfully enacted tax, the Court would need to be persuaded of several additional arguments that we wisely do not reach. I highlight two.

First, we would need to agree with petitioners that Congress can tax income only if it is actually received or "realized." That alleged requirement appears nowhere in the text of the Sixteenth Amendment. See Brief for John R. Brooks et al. as *Amici Curiae* 14–21 (explaining that the phrase "from whatever source derived" served only to overrule *Pollock*). Moreover, both before and after the Sixteenth Amendment was adopted, the term "income" was widely recognized as flexible enough to include both realized and unrealized gains. See Brief for United States 14–26 (collecting sources); Brief for Professors of Tax Law et al. as *Amici Curiae* 6–20 (same).

The alleged realization requirement is, instead, drawn from a decision of this Court, *Eisner* v. *Macomber*, 252 U. S. 189 (1920). *Macomber* struck down a tax on stock dividends, ostensibly because the taxpayer "ha[d] not realized or received any income in the transaction." *Id.*, at 212. Like

JACKSON, J., concurring

*Pollock, Macomber* was "promptly and sharply criticised." *Helvering* v. *Griffiths*, 318 U. S. 371, 373 (1943). Over the two decades that followed our pronouncement, we "limited" *Macomber*'s realization requirement "to the kind of dividend there dealt with," 318 U. S., at 375, while also "undermin[ing] . . . the original theoretical bases of the decision in" other contexts, *id.*, at 394.

Thus, there is no constitutional requirement, from *Macomber* or otherwise, that a taxpayer "be able to sever . . . the gain from his original capital" in order to be taxed on it. *Helvering* v. *Bruun*, 309 U. S. 461, 469 (1940); see also *Cottage Savings Assn.* v. *Commissioner*, 499 U. S. 554, 559 (1991) (explaining that, properly understood, "the concept of realization is 'founded on administrative convenience,'" compared to the "'cumbersome'" process of "valuing assets on an annual basis to determine . . . appreciat[ion]"). In the lower courts too, *Macomber*'s definition of income has long been deemed outmoded, if not overruled.[1] Any litigant seeking to sustain her case on the basis of *Macomber* would have to bring back from the dead its Court-created limit on Congress's power.[2]

---

[1] See, *e.g.*, *Commissioner* v. *Obear-Nester Glass Co.*, 217 F. 2d 56, 60 (CA7 1954) ("Even as to income derived from capital [*Macomber*] has been limited to its specific facts"); *United States* v. *James*, 333 F. 2d 748, 752 (CA9 1964) ("[I]nsofar as [*Macomber*] purported to offer a comprehensive definition of the term income as used in the Sixteenth Amendment, it has been discarded"); *Prescott* v. *Commissioner*, 561 F. 2d 1287, 1293 (CA8 1977) ("[T]he Supreme Court has found it necessary to abandon [*Macomber*'s] attempt at an all-inclusive definition of income").

[2] To be sure, *Macomber* is a hard decision to parse, and it might be read to allow taxation of an asset only if the owner receives some new, increased value. See *Eisner* v. *Macomber*, 252 U. S. 189, 211 (1920) (emphasizing that a stock dividend does not necessarily "increase the intrinsic value of [the taxpayer's] holding"); see also *Koshland* v. *Helvering*, 298 U. S. 441, 445–446 (1936). If that reading is correct, *Macomber* would not preclude taxation of unrealized gains. See Brief for United States 33–34; Brief for Alex Zhang as *Amicus Curiae* 26.

4                    MOORE *v.* UNITED STATES

JACKSON, J., concurring

Second, even if we were to hold that a uniform tax violated the Sixteenth Amendment, we would still need to confirm that the tax was a direct tax before requiring apportionment. The Constitution does not exhaustively define direct taxes, though it appears the category was originally intended to encompass only land and head taxes. See, *e.g.*, *Hylton* v. *United States*, 3 Dall. 171, 175 (1796) (opinion of Chase, J.); *id.*, at 177 (opinion of Paterson, J.); *id.* at 183 (opinion of Iredell, J.). But the Constitution does expressly exclude certain taxes—"Duties, Imposts and Excises"—from apportionment, and we have long interpreted those categories of taxes broadly. Art. I, §8; see also *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 581–582 (1937). Indeed, we have upheld uniform taxes as excises, even when predicated on something that, if taxed on its own, might require apportionment or even be nontaxable. See *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 150–152, 165 (1911). In this case, the Government argues that the MRT can be understood as an excise tax on the privilege of doing business through a controlled foreign corporation. See Brief for United States 46–49. That argument, too, would need to be considered before we could strike down a uniform tax like the MRT.

\*     \*     \*

I have no doubt that future Congresses will pass, and future Presidents will sign, taxes that outrage one group or another—taxes that strike some as demanding too much, others as asking too little. There may even be impositions that, as a matter of policy, all can agree are wrongheaded. However, *Pollock* teaches us that this Court's role in such disputes should be limited. "[T]he remedy for such abuses is to be found at the ballot-box, and in a wholesome public opinion which the representatives of the people will not long, if at all, disregard, and not in the disregard by the judiciary of powers that have been committed to another

JACKSON, J., concurring

branch of the government." *Pollock*, 158 U. S., at 680 (Harlan, J., dissenting).

With that understanding, I join the Court's opinion in full.

Cite as: 602 U. S. ____ (2024)   1

BARRETT, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

———————

No. 22–800

———————

## CHARLES G. MOORE, ET UX., PETITIONERS
### v. UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 20, 2024]

JUSTICE BARRETT, with whom JUSTICE ALITO joins, concurring in the judgment.

This case comes down to two questions. Have the Moores realized income from their KisanKraft shares? And if they have not, may Congress attribute KisanKraft's income to the Moores?

Our precedent already decides the first question: Shareholders receive income when they sell their shares or when a corporation distributes profits back to its investors by declaring a dividend. Notwithstanding this precedent, the Government asserts its power to tax without apportionment *all* economic gains, including appreciation in property value. The Court does not address this issue. *Ante*, at 8. It focuses on the second instead, and, casting our precedent as well settled, holds that Congress can attribute KisanKraft's income to the Moores. As I explain below, I think the issue is more complex than the Court lets on. But whatever my disagreement with the Court's reasoning, it bears emphasis that the Moores' case involves the Mandatory Repatriation Tax (MRT), which is a specific tax imposed upon the American shareholders of a closely held foreign corporation. A different tax—for example, a tax on shareholders of a widely held or domestic corporation—would present a different case.

BARRETT, J., concurring in judgment

## I

The question on which we granted review is "[w]hether the Sixteenth Amendment authorizes Congress to tax unrealized sums without apportionment among the states." Pet. for Cert. i. The answer is straightforward: No.

## A

The Constitution distinguishes between taxes on income and taxes on property. Income taxes must apply uniformly across the country, Art. I, §8, cl. 1, while "direct" taxes—like property taxes—must be apportioned among the States, §2, cl. 3; §9, cl. 4.[1] Apportionment is an onerous burden, both technically and politically, because it requires Congress to allocate the total tax liability to each State according to its population. There have been very few federal property taxes in this nation's history (and none in the modern era). By design and in fact, the apportionment rule has left property taxation primarily to the States. See *post*, at 7–12 (THOMAS, J., dissenting).

In *Pollock* v. *Farmers' Loan & Trust Co.*, the Court held that the apportionment rule applies not only to taxes on real and personal property, but also to taxes on income "derived" from that property—say, rents from leasing farmland. 158 U. S. 601, 618 (1895). The decision left Congress effectively unable to tax most nonlabor income. The Sixteenth Amendment overruled *Pollock*'s second holding, stating that "Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment." But it did not overrule *Pollock*'s first holding that taxes on personal property are direct taxes. See *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 19 (1916);

---

[1] Direct taxes also include a capitation tax, which imposes a tax on every person "without regard to property, profession, or any other circumstance." *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 571 (2012) (*NFIB*) (internal quotation marks omitted; emphasis deleted).

BARRETT, J., concurring in judgment

*National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 571 (2012).

As the text of the Sixteenth Amendment indicates, income is financial gain that "derive[s]" from property or another source. See, *e.g.*, *United States* v. *Phellis*, 257 U. S. 156, 168–169 (1921); *Stratton's Independence, Ltd.* v. *Howbert*, 231 U. S. 399, 415 (1913); Webster's New International Dictionary 1089 (1909) (Webster's) ("income" is "[t]hat gain or recurrent benefit (usually measured in money) which proceeds from labor, business, or property"). To capture the distinction between property and income, we have described property as the "seed" and income as the "fruit that it will yield." *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88, 99 (1936). Thus, a condominium is a landlord's property, and rents are the income she receives from leasing it. A patent is an inventor's property, and royalties are the income she receives from licensing it. A capital fund is a banker's property, and interest is the income she receives from lending it.

The Sixteenth Amendment's reference to income "derived" from any source encompasses a requirement that income, to be taxed without apportionment, must be *realized*. See *post*, at 23–25 (THOMAS, J., dissenting). While the Government stresses that the Amendment did not include a "realization" requirement, Brief for United States 15–16, "realize" and "derive" have long referred to the same concept. Compare Webster's 1778 ("realize" means to "convert an intangible right or property into real (tangible) property"; to "convert any kind of property (considered as fluctuating or uncertain in value) into money"), with *id.*, at 601 ("derivation" is the "[a]ct of receiving anything from a source, as profits from capital"). The Court has used "realization" this way (including in today's opinion) when discussing income taxes on corporate shareholders. See, *e.g.*, *ante*, at 8; *Cullinan* v. *Walker*, 262 U. S. 134, 138 (1923). And we have also

used the term "realized" in cases involving a tax on accumulated corporate earnings, *Ivan Allen Co.* v. *United States*, 422 U. S. 617, 627–629 (1975), debt discharge, *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, 3 (1931), real estate improvements, *Helvering* v. *Bruun*, 309 U. S. 461, 469 (1940), punitive damages, *Commissioner* v. *Glenshaw Glass Co.*, 348 U. S. 426, 431 (1955), and meal allowances, *Commissioner* v. *Kowalski*, 434 U. S. 77, 83 (1977), to name a few.  Many opinions use "derived" and "realized" more or less interchangeably.  See, *e.g.*, *Diedrich* v. *Commissioner*, 457 U. S. 191, 199 (1982); *Commissioner* v. *Jacobson*, 336 U. S. 28, 39 (1949); *Helvering* v. *Horst*, 311 U. S. 112, 118 (1940); *Goodrich* v. *Edwards*, 255 U. S. 527, 535 (1921); *Gray* v. *Darlington*, 15 Wall. 63, 65–66 (1872); *Pollock*, 158 U. S., at 696 (Jackson, J., dissenting).

The "commonly understood meaning of the term" income when the Sixteenth Amendment was ratified requires that a gain be "realized" or "derived"—*e.g.*, through a sale or other transaction—to be taxed without apportionment. *Merchants' Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509, 519–520 (1921); see *post*, at 23–25 (Thomas, J., dissenting). "Income within the meaning of the Sixteenth Amendment . . . is income as the word is known in the common speech of men." *Safety Car*, 297 U. S., at 99.  And in the years surrounding the ratification of the Sixteenth Amendment, income "was used in ordinary parlance to refer only to realized gains."  Brief for Professors of Law and Linguistics as *Amicus Curiae* 17; see *id.*, at 18–22 (instances of the word "income" between 1900 and 1912 in the Corpus of Historical American English referred to "economic gain tied to a realization event").

Regardless of whether one uses the term "derived" or "realized," the important point is this: The Sixteenth Amendment and the Direct Tax Clause distinguish between taxes on property, which are subject to apportionment, and taxes on income derived or realized from that property, which are

BARRETT, J., concurring in judgment

not.

### B

The Moores have not realized income from their KisanKraft shares. Shares yield income when the corporation declares a dividend—*i.e.*, when the corporation distributes its profits to shareholders. See *Lynch* v. *Hornby*, 247 U. S. 339, 344 (1918) ("Dividends are the appropriate fruit of stock ownership [and] are commonly reckoned as income"); *Gibbons* v. *Mahon*, 136 U. S. 549, 557–558 (1890). But KisanKraft has never declared a dividend. Nor have the Moores realized income by selling or otherwise disposing of their shares. See *Taft* v. *Bowers*, 278 U. S. 470, 481–482 (1929). Because they have not received a dividend, profit from selling their shares, or any other pecuniary benefit from their stock ownership, the Moores have not yet received a return on their original investment in the company. In short, they have not "derived" income from their shares because nothing has *come in*.

The Government resists this conclusion. It concedes, as it must, that a tax on the "total value of" the shares "at a particular point [in] time" is a "quintessential tax on property" that must be apportioned. Tr. of Oral Arg. 127–128; see *NFIB*, 567 U. S., at 571; *Brushaber*, 240 U. S., at 19. But looking at property value *across two points in time* makes a difference, the Government says, because then the tax targets *appreciation* rather than the asset's value. As the Government sees it, Congress may tax without apportionment "*all* economic gains" measured "'between two points in time.'" Brief for United States 9, 15. And the increase in value between Time A and Time B is "income."

The Government is unable to cite a single decision upholding an unapportioned tax on appreciation. Tr. of Oral Arg. 89, 91–92. That is no surprise, because our precedent forecloses the Government's argument. We have explained that income includes neither "a gain accruing to capital" nor

"a growth or increment of value in the investment." *Phellis*, 257 U. S., at 169; see also *Safety Car*, 297 U. S., at 99 (income is the "fruit that is born of capital, not the potency of fruition"). And we have stressed that "economic gain is *not* always taxable as income." *Bruun*, 309 U. S., at 469 (emphasis added); see also *Commissioner* v. *Indianapolis Power & Light Co.*, 493 U. S. 203, 214 (1990) ("[A] taxpayer does not realize taxable income from every event that improves his economic condition"). Although appreciation looks valuable on paper, "the stockholder has received nothing out of the company's assets for his separate use and benefit," and market fluctuations could "wip[e] out the entire investment" before the owner ever receives a dime of "income within the meaning of the Sixteenth Amendment." *Eisner* v. *Macomber*, 252 U. S. 189, 211 (1920).

If the Government were right that appreciation is income, it is hard to make sense of our decision in *Ivan Allen Co.* There, we considered a tax on accumulated earnings—*i.e.*, income that the corporation retains as assets on its balance sheet instead of distributing to its shareholders. 422 U. S., at 624–625. Because corporate tax rates were generally lower than individuals' marginal tax rates, Congress was concerned that corporations would be used to reduce their "shareholders' overall tax liability by accumulating earnings beyond the reasonable needs of the business." *Id.,* at 624. So Congress imposed a tax on earnings that corporations allowed to accumulate "beyond the reasonable and reasonably anticipated needs of the business." *Id.*, at 621, 624. In upholding the tax, we took great care to explain that the tax "is not directed at the unrealized appreciation of liquid assets"; "any unrealized appreciation in the value of the taxpayer's portfolio . . . does not enter into the computation of the tax. *Id.*, at 627–628. The tax took into account the value and appreciation of the corporation's assets "only in measuring reasonableness of accumulation of the earnings and profits that otherwise independently exist."

BARRETT, J., concurring in judgment

*Id.*, at 628. In other words, asset appreciation was only relevant with respect to how much of the corporation's *income* could be taxed under the statute. More assets meant less income reasonably could be accumulated. If asset appreciation itself were just as taxable as income, there would have been no reason for the Court's painstaking efforts to explain the scope of the tax. See *id.*, at 627–629.[2]

### C

In upholding the tax, the Ninth Circuit opined that "[w]hether the taxpayer has realized income does not determine whether a tax is constitutional." 36 F. 4th 930, 935 (2022). In its view, the "Supreme Court has made clear that realization of income is not a constitutional requirement." *Id.*, at 936. The Ninth Circuit misread our cases. Contrary to its assertion, this Court has "never abandoned the core requirement that income must be realized to be taxable without apportionment." 53 F. 4th 507, 508 (CA9 2022) (Bumatay, J., dissenting from denial of rehearing en banc). What we *have* done is reject efforts to narrow what it means to realize income.

For example, in *Helvering* v. *Bruun*—one of the cases on which the Ninth Circuit relied—we clarified that "the realization of gain need not be in cash derived from the sale of an asset" but can also "result [from] exchange of property, payment of the taxpayer's indebtedness, relief from a liability, or other profit realized from the completion of a transaction." 309 U. S., at 469. In that case, a tenant built a valuable building on the landlord's property. Upon termination of the lease, the landlord regained possession of the

_____

[2] Although *Ivan Allen Co.* involved the interpretation of a tax statute, our analysis sheds light on the Constitution's definition of income because we have long interpreted "gross income" in the Internal Revenue Code to reach "'the full measure of [Congress's] taxing power.'" *Commissioner* v. *Kowalski*, 434 U. S. 77, 82 (1977) (quoting *Helvering* v. *Clifford*, 309 U. S. 331, 334 (1940)).

property—and acquired the building too. When the Internal Revenue Service came calling, the landlord protested that he had realized no taxable gain from the building in the year that the lease ended. We sided with the IRS. Gain from a contributed building is *not* like an "accrua[l] of value due to extraneous and adventitious circumstances"—for example, appreciation from a booming real estate market. *Id.*, at 467. Nor does realization require the ability to "sever the improvement begetting the gain from [the] original capital." *Id.*, at 469. "If that were necessary," we said, "no income could arise from the exchange of property; whereas such gain has always been recognized as taxable gain." *Ibid.* None of that remotely suggests, however, that realization is not required or (relatedly) that appreciation counts as taxable income. Instead, it explains that profit (there, the building) is realized when received, even if it cannot be physically separated from the capital (there, the land).

In dispensing with the realization requirement, the Ninth Circuit also cited *Helvering* v. *Horst*. But *Horst*, like *Bruun*, emphasizes that realization does not require cash in hand—*not* that realization is irrelevant. In *Horst*, "the owner of negotiable bonds . . . detached from them negotiable interest coupons shortly before their due date and delivered them as a gift to his son who in the same year collected them at maturity." 311 U. S., at 114. The bond owner insisted that the interest coupons were not income taxable to *him*, because his son owned them at the time they came due. See *id.*, at 114–115. We rejected the argument that the bond owner could "escape all tax by giving away his right to income in advance of payment." *Id.*, at 116. "The power to dispose of income is the equivalent of ownership of it." *Id.*, at 118. And while the donor chose not to take the interest itself, he still "*realized* the fruits of his investment." *Id.*, at 117 (emphasis added). Realization does not depend on how the user chooses to enjoy the income—whether through "the purchase of goods at the corner grocery, the

BARRETT, J., concurring in judgment

payment of his debt there, or such non-material satisfactions as may result from . . . a gift to his favorite son." *Ibid.* Far from disavowing the realization requirement, the Court emphasized that a taxpayer cannot escape realization (and therefore tax liability) by giving away the fruit of his capital.

In sum, realization may take many forms, but our precedent uniformly holds that it is required before the Government may tax financial gain without apportionment. Realization is a question of substance, not form. *Diedrich*, 457 U. S., at 195. In general, realization is "the last step . . . by which [one] obtains the fruition of the economic gain which has already accrued to him." *Horst*, 311 U. S., at 115. Our cases describe many ways income might be realized; a rigid definition does not capture them all. See, *e.g.*, *MacLaughlin* v. *Alliance Ins. Co.*, 286 U. S. 244, 249 (1932) ("sale or other disposition of property"); *Safety Car*, 297 U. S., at 93 ("profits owing to a patentee by the infringer of a patent"); *Kirby Lumber*, 284 U. S., at 2–3 ("clear gain" resulting from corporation repurchasing bonds it issued for less than the corporation had initially "received [for] their par value"). The common thread is that to realize income, one must receive something new and valuable beyond the property she already owns.

## II

Though the Moores did not realize income as shareholders, KisanKraft realized income as a corporation—profits from supplying farm equipment to customers in India. The Government argues that, because the MRT targets KisanKraft's realized income, it falls within the Sixteenth Amendment and is not subject to the apportionment rule. Brief for United States 42. But the question is not whether *some* taxable person or entity has realized income at *some* point. Rather, as the Court emphasizes, we must determine

BARRETT, J., concurring in judgment

whether Congress has the power to tax the Moores on income that KisanKraft realized. *Ante*, at 8. Put differently, can Congress disregard KisanKraft's corporate form, attribute KisanKraft's income to its shareholders, and tax its shareholders on that income?

The Court concludes that it can, describing our case law as "clear and definitive" in the Government's favor. *Ante*, at 13. I read our cases differently. As I understand our precedent, it leaves room for Congress to disregard the corporate form in some circumstances. But that is not because Congress—as the Court suggests—can treat corporations interchangeably with partnerships, whose partners have always been subject to pass-through taxation on the partnership's income. See *United States* v. *Basye*, 410 U. S. 441, 453–454 (1973). Rather, our cases allow Congress to disregard the corporate form to determine whether the shareholder received income *in substance*, if not in form.

A

Our precedent suggests that Congress's power to attribute a corporation's income to its shareholders for tax purposes is limited. *Eisner* v. *Macomber* is the most recent case addressing this issue—and it was decided more than a century ago. There, the Standard Oil Company of California chose to reinvest its profits back into the corporation rather than distributing them to shareholders. 252 U. S., at 200. Those retained earnings caused an imbalance in the corporation's capital account. So to adjust its books, Standard Oil declared a stock dividend that issued new shares to existing shareholders while diluting the value of their previous shares—which left the shareholders in the same financial position as before the transaction. See *id.*, at 200–201, 212. The Court held that shareholder Myrtle Macomber did not *realize income* from the stock dividend because she "received nothing out of the company's assets for [her] sepa-

Cite as: 602 U. S. ____ (2024)           11

BARRETT, J., concurring in judgment

rate use and benefit." *Id.*, at 211. The shareholder's original investment "still remains the property of the company, and subject to business risks which may result in wiping out the entire investment." *Ibid.* The stock dividends were "evidenc[e]" that her capital previously had *appreciated*, but the dividends themselves "added nothing to" her property and were therefore not *income derived from* it. *Id.*, at 212 (while the "shareholder is the richer because of an increase of his capital . . . he has not realized or received any income in the transaction").[3]

Importantly for our purposes, the Court also rejected the Government's theory that Congress could attribute the *corporation's* income to its shareholders. See *id.*, at 213. The Court expressed "no doubt of the power or duty of a court to look through the form of the corporation and determine the question of the stockholder's right, in order to ascertain *whether he has received income* taxable by Congress without apportionment." *Ibid.* (emphasis added). But the Court would not "disregard the essential truth disclosed": It would not "ignore the substantial difference between corporation and stockholder" and "treat the entire organization as unreal; look upon stockholders as partners, when they are not such . . . and indulge the fiction that they have received and realized a share of the profits of the company which in truth they have neither received nor realized." *Id.*, at 214. The Court therefore refused to uphold the tax as a tax on attributed corporate income.

That left one potential justification for the tax—that the Direct Tax Clause's apportionment requirement did not apply to taxes on the stockholder's undivided interest in the corporation. The Court rejected that argument too, adhering to *Pollock*'s holding that a tax on a shareholder's ownership interest is a tax on property. The Court explained

---

[3] The Court today does not cast doubt on *Macomber*'s holding that appreciation is not income. See *ante*, at 23.

that *Pollock* "overruled" the holding of *Collector* v. *Hubbard*, 12 Wall. 1 (1871), that Congress could "tax without apportionment a stockholder's interest in accumulated earnings prior to dividend declared," *Macomber*, 252 U. S., at 218.   The Court acknowledged that the Sixteenth Amendment had overruled *Pollock*'s holding that a tax on *income derived from* property must be apportioned.  252 U. S., at 219.  But it stressed that the Sixteenth Amendment did not otherwise disturb the law concerning the Direct Tax Clause—including *Pollock*'s holding that the Clause applies to "property, real and personal." *Id.*, at 206; see *id.*, at 219 ("[T]he Amendment applies to income only"). Because a stockholder's ownership interest in the corporation is personal property—"capital, not income"—Congress must apportion any tax on it. *Ibid.*

Today, the Court does not dispute either that income requires realization or that a tax on stock ownership must be apportioned.  Instead, it says that the income of a closely held foreign corporation can be attributed to its shareholders for tax purposes.  That might be right, but the Court's reasons for saying so are wrong: It dismisses the "attribution" portion of *Macomber* as dicta and argues that four subsequent cases undercut it. *Ante*, at 13.  I disagree.  None of these cases contradicts *Macomber*'s admonition that Congress cannot "look upon stockholders as partners . . . when they are not"; Congress may not "indulge the fiction that they have received and realized a share of the profits of the company" when they have not.  252 U. S., at 214; see also *Helvering* v. *Griffiths*, 318 U. S. 371, 376–377, and n. 11 (1943).  Rather, the Court's cases all illustrate the principle that the validity of an income tax must be assessed "according to truth and substance, [not] form." *Macomber*, 252 U. S., at 206.

*Burk-Waggoner Oil Assn.* v. *Hopkins* upheld Congress's power to tax an "unincorporated joint stock association" as

a corporation even though state law treated it as a partnership. 269 U. S. 110, 110–111 (1925). We disregarded the state-law label because the associations acted as corporations: They had "a fixed capital stock divided into shares," they "manage[d] their affairs by a board of directors and executive officers," and they "conduct[ed] their business in the general form and mode of procedure of a corporation." *Id.*, at 113–114. "[N]othing in the Constitution," we explained, "precludes Congress from taxing as a corporation an association which, although unincorporated, transacts its business as if it were." *Id.*, at 114. *Burk-Waggoner* thus held that for tax purposes, Congress could treat a partnership like a corporation when it acts like a corporation. We did not decide whether Congress may treat a *corporation like a partnership*—*e.g.*, attributing its income to shareholders—when, in truth and substance, it operates as a corporation.

Next up is *Burnet* v. *Leininger*, 285 U. S. 136 (1932). Although that case involved a partnership, the issue was about the "anticipatory assignment of income doctrine." See *Commissioner* v. *Banks*, 543 U. S. 426, 433–434 (2005) ("A taxpayer cannot exclude an economic gain from gross income by assigning the gain in advance to another party" (citing, *inter alia*, *Lucas* v. *Earl*, 281 U. S. 111, 114–115 (1930)); 1 B. Bittker, J. Eustice, G. Goldstein, & T. Brantley, Federal Income Taxation of Corporations and Shareholders ¶2.07[3] (2024). The taxpayer, who happened to be one-half partner in a laundry business, tried to reduce his tax liability by assigning a portion of his income to his wife. 285 U. S., at 141. We rejected that artifice and affirmed Congress's ability to "ta[x] the salary and fees of the person who earned them." *Id.*, at 141–142 (citing *Lucas*, 281 U. S., at 114). This case, too, is about classifying taxes according to substance rather than form.

The Court also invokes *Heiner* v. *Mellon*, which blesses Congress's power to tax "partners" on their "proportionate

BARRETT, J., concurring in judgment

share of the net income of the partnership" even where the partnership's income is not "currently distributable" to the partners under state law.  304 U. S. 271, 280–281 (1938). The case rests on the "axiomatic" and "firmly established" rule of partnership taxation that "each partner must pay taxes on his distributive [*i.e.*, proportional] share of the partnership's income without regard to whether that amount is actually distributed to him."  *Basye*, 410 U. S., at 453–454 (discussing *Heiner*).  Given the unique partnership context, *Heiner* sheds no light on Congress's power to tax shareholders on *a corporation's* income.[4]

Finally, in *Helvering* v. *National Grocery Co.*, 304 U. S. 282 (1938), the Court sustained a deficiency tax imposed on a corporation that was used to shelter the income of its sole shareholder.  (Notably, the corporation, not the share-holder, was the taxpayer.)  In the course of rejecting the corporation's various challenges to the tax, the Court opined that "Kohl, the sole owner of the business, could not by conducting it as a corporation, prevent Congress, if it chose to do so, from laying on him individually the tax on the year's profits."  *Id.*, at 288.  That dictum, if correct, is consistent with *Macomber*'s recognition that courts can look through the corporate form to determine the substance of the shareholder's relationship to the income.  Because Na-tional Grocery's income was really just the income of Kohl, its sole owner, the Court suggested that attributing it to him for tax purposes would be permissible.

---

[4] Partnerships are distinct from corporations in many other fundamen-tal ways.  For example, partnerships traditionally do not have a legal identity distinct from the partners and do not enjoy the limited liability characteristic of the corporate form.  They are instead "an aggregation of individuals operating the business as co-owners with individual rights and duties."  1 J. Cox & T. Hazen, Law of Corporations §1.07 (3d ed. 2010).  For purposes of federal diversity jurisdiction, partnerships are citizens wherever their partners are, whereas corporations have citizen-ship distinct from their shareholders.  See *Carden* v. *Arkoma Associates*, 494 U. S. 185, 187–189 (1990).

BARRETT, J., concurring in judgment

Thus, in matters of corporate form and income attribution—as in the definition of income—labels do not control. But acknowledging that substance controls is a far cry from asserting that Congress is free to wholly disregard the corporate form. That would permit Congress to tax the shareholder without regard to the substance of her relationship to the corporation and would contradict *Macomber*'s holding that Standard Oil's income could not be attributed to its shareholders. See 252 U. S., at 213–214. Our precedent does not give Congress carte blanche to attribute corporate income to a shareholder. Instead, it suggests that Congress has a limited power to do so that depends on the relationship between the shareholder and the income.[5]

### B

Although I believe that the Court today is too quick to bless the attribution of corporate income to shareholders, its holding is narrow. The Court affirms Congress's power to tax shareholders on "the undistributed income of American-controlled foreign corporations," but it says that the

---

[5] The Court asserts that Congress no longer observes *Macomber*'s distinction between shareholders and the corporate entity for tax purposes. *Ante*, at 11. That paints an incomplete picture. After *Macomber*, Congress ended its longstanding practice of attributing corporate income to shareholders when the corporation operated as a tax shelter. See *Ivan Allen Co.*, 422 U. S., at 624–626, and n. 8; *Griffiths*, 318 U. S., at 377 n. 12, 385. That practice reemerged in the 1930s when Congress began taxing shareholders of *closely held foreign* corporations on undistributed corporate earnings. Revenue Act of 1937, §201, 50 Stat. 822. To my knowledge, Congress has not returned to that approach for domestic or widely held corporations of the kind *Macomber* considered. And while Congress continues to attribute income of certain closely held foreign corporations to their U. S. shareholders today, see 26 U. S. C. §951 *et seq.* ("subpart F"), doing so might be consistent with *Macomber*'s recognition that Congress can disregard the corporate form when, in substance, it is reasonable to treat the income of the corporation as that of the shareholders. The Court's "arbitrariness" test seems to get at a similar point, but, by dismissing the relevance of the corporate form altogether, it confuses the analysis.

BARRETT, J., concurring in judgment

Due Process Clause cabins that power by requiring income attributions not to be "arbitrary." *Ante*, at 22–23. The arbitrariness inquiry, the Court previews, turns on "the taxpayer's relationship to the underlying income." *Ante*, at 14, n. 4 (citing *Burnet* v. *Wells*, 289 U. S. 670, 678–679 (1933)).

I agree that the Constitution prohibits Congress from arbitrarily attributing to the taxpayer someone else's income. Our cases have located that limit in the Due Process Clause. See *Burnet*, 289 U. S., at 678–679; *Hoeper* v. *Tax Comm'n of Wis.*, 284 U. S. 206, 215 (1931) ("That which is not in fact the taxpayer's income cannot be made such by calling it income"). But an arbitrariness limit is implicit in the Sixteenth Amendment too. Virtually all property was income at some point. Ford Motor Company uses its income to buy steel for making trucks. But surely Congress cannot attribute Ford's earnings to anyone who owns an F–250. The Amendment's reference to "derived" income presupposes that the income belongs to the taxpayer, or is at least fairly attributable to her. Otherwise the taxpayer's property (*e.g.*, the truck she drives) could be taxed without apportionment just because it was once *somebody else's* income (*e.g.*, the earnings Ford used to purchase the steel).

While an arbitrariness limit on income attribution surely exists, its contours are uncertain. We have never before applied the arbitrariness test to a tax law that attributes a corporation's income to its shareholders. At oral argument, the Government identified a series of factors that the Court has considered in attribution cases involving license agreements and trusts. See Tr. of Oral Arg. 119–123. One is whether the taxpayer has "sufficient power and control over . . . the income" that it is "reasonable to treat him as the recipient of the income for tax purposes." *Commissioner* v. *Sunnen*, 333 U. S. 591, 604 (1948). Another is whether the taxpayer receives a special "privilege or benefit" from the entity that earns the income. *Burnet*, 289 U. S., at 679. A third is whether the corporation is foreign and thus outside

BARRETT, J., concurring in judgment

the reach of an accumulated earnings tax. Cf. *Ivan Allen Co.*, 422 U. S., at 624. These factors may serve as a useful guide for lower courts when applying today's decision to taxes that attribute income from other types of corporations to an individual taxpayer. Just because Congress can attribute income of a closely held foreign corporation like KisanKraft to its shareholders does not mean it has equal power to attribute the income of a publicly traded domestic corporation to anyone holding a few shares in her retirement account.

C

Congress's power to attribute the income of closely held corporations to their shareholders is a difficult question—and unfortunately, the parties barely addressed it. Without focused briefing on the attribution question, I would not resolve it. Subpart F and the MRT may or may not be constitutional, nonarbitrary attributions of closely held foreign corporations' income to their shareholders. In this litigation, however, the Moores have conceded that subpart F is constitutional. Tr. of Oral Arg. 9. And I agree with the Court that subpart F is not meaningfully different from the MRT in how it attributes corporate income to shareholders. *Ante*, at 20–21. Taxpayers generally bear the burden to show they are entitled to a refund. *United States* v. *Janis*, 428 U. S. 433, 440 (1976); see also *Haaland* v. *Brackeen*, 599 U. S. 255, 277–278 (2023) (burden to show unconstitutionality). Given the Moores' concession, they have not met that burden here. For that reason, I concur in the Court's judgment affirming the judgment below.

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———

No. 22–800

———

## CHARLES G. MOORE, ET UX., PETITIONERS
### *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 20, 2024]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, dissenting.

Charles and Kathleen Moore paid $14,729 in taxes on an investment that never yielded them a penny. They challenge that tax—the Mandatory Repatriation Tax (MRT)—as unconstitutional. As relevant, they argue that a tax on unrealized investment gains is not a tax on "incomes" within the meaning of the Sixteenth Amendment, and it therefore cannot be imposed "without apportionment among the several States."

The Moores are correct. Sixteenth Amendment "incomes" include only income realized by the taxpayer. The text and history of the Amendment make clear that it requires a distinction between "income" and the "source" from which that income is "derived." And, the only way to draw such a distinction is with a realization requirement. Our precedent says as much. In *Eisner* v. *Macomber*, 252 U. S. 189 (1920), the Court explained that "the characteristic and distinguishing attribute of income," as the term is used in the Sixteenth Amendment, is that it is "*received* or *drawn by* the recipient (the taxpayer) for his *separate* use, benefit and disposal." *Id.*, at 207. Because the Moores never actually received any of their investment gains, those unrealized gains could not be taxed as "income" under the Sixteenth Amendment.

THOMAS, J., dissenting

The Ninth Circuit wrongly rejected the Moores' challenge on the ground that "realization of income is not a constitutional requirement." 36 F. 4th 930, 936 (2022). That conclusion cannot be reconciled with the Sixteenth Amendment as the Court correctly interpreted it in *Macomber*. We therefore granted certiorari to answer the question "[w]hether the Sixteenth Amendment authorizes Congress to tax unrealized sums without apportionment among the states," *i.e.*, as "incomes." Pet. for Cert. i.

Today, the Court upholds the MRT only by ignoring the question presented. It does "not address the Government's argument that a gain need not be realized to constitute income under the Constitution." *Ante*, at 12–13, n. 3. Instead, the Court answers the question "whether Congress may attribute an entity's realized and undistributed income to the entity's shareholders or partners, and then tax the shareholders or partners on their portions of that income." *Ante*, at 8. After changing the subject, the majority upholds the MRT by relying on unrelated precedent to derive a "clear rule" that "Congress can attribute the undistributed income of an entity to the entity's shareholders or partners." *Ante*, at 10–11.

I respectfully dissent. The Ninth Circuit erred by concluding that realization is not a constitutional requirement for income taxes. And, the majority's "attribution" doctrine is an unsupported invention.

I

The Sixteenth Amendment provides: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." The central dispute in this case—at least, in the case briefed by the parties—concerns the meaning of the word "incomes" in the Amendment. The Moores define "income" as "'a gain, a profit, [or] something of exchangeable value'

THOMAS, J., dissenting

[that] is '*received* or *drawn* by the recipient (the taxpayer) for his *separate* use, benefit and disposal.'" Brief for Petitioners 1 (quoting *Macomber*, 252 U. S., at 207). This idea—that "income" is only something actually available for the taxpayer's use—is known as "realization." The Government rejects the realization requirement, arguing instead that "income" captures "all economic gains" whether or not they are actually realized. Brief for United States 14 (internal quotation marks omitted).

"Income" in the Sixteenth Amendment refers only to income realized by the taxpayer. The Amendment resolved a long-running conflict over the scope of the Federal Government's taxing power. It paved the way for a federal income tax by creating a new constitutional distinction between "income" and the "source" from which that income is "derived." Drawing that distinction necessitates a realization requirement.

A

To understand the text of the Sixteenth Amendment—and, in particular, the meaning of the word "income"—one must first understand how the Amendment came about. The Constitution's original taxing provisions divided taxes into two classes: direct and indirect taxes. And, as part of a delicate constitutional compromise, the original taxing provisions required direct taxes to be apportioned among the States based on population. Disputes about the scope of the direct-tax category came to a head in *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601 (1895), when this Court held that many income taxes were direct taxes subject to the apportionment requirement. In reaching this conclusion, the Court held that income could not be distinguished from its source for purposes of classifying an income tax as direct or indirect. The Sixteenth Amendment was ratified to overrule that holding from *Pollock*, and it can therefore

THOMAS, J., dissenting

be understood only in the context of *Pollock* and the preceding history.

### 1

The Sixteenth Amendment modified the Constitution's original regulations of Congress's taxing power. The text of those provisions is therefore the natural starting point for interpreting the Sixteenth Amendment. The Taxing Clause provides Congress with broad authority to impose taxes. Other Clauses, including the Direct Tax Clause, classify different kinds of taxes and set corresponding limitations on Congress's power to impose them. The Sixteenth Amendment alters those rules by making clear that taxes on income are not subject to the limitations imposed on direct taxes.

The Constitution gives Congress the power to impose "Taxes" of any kind, including income taxes. The Taxing Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." Art. I, §8, cl. 1. This Clause is the sole source of Congress's authority to impose taxes. And, that authority is broad. Nothing in the Constitution limits the kinds of taxes that Congress may impose. As the Court has explained, "the authority conferred upon Congress by" the Taxing Clause "is exhaustive and embraces every conceivable power of taxation." *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 12 (1916).

But, the Constitution restricts the manner in which Congress may impose taxes. It accomplishes this by dividing taxes into two classes—direct and indirect taxes—and imposing a distinct limitation applicable to each of those classes.[1]

_____

[1] The General Welfare Clause—quoted alongside the rest of the Taxing

THOMAS, J., dissenting

Start with the class of direct taxes. The Direct Tax Clause provides: "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." Art. I, §9, cl. 4. The Constitution does not expressly identify any tax as direct other than a "Capitation." A "capitation"—also called a "poll tax"—is "[a] fixed tax levied on each person within a jurisdiction." Black's Law Dictionary 1760 (11th ed. 2019) (defining "tax"). At the founding, the class of direct taxes was also understood to include taxes on real property, and perhaps taxes on personal property. See *infra*, at 14–15.

Indirect taxes, on the other hand, include "Duties, Imposts and Excises." Art. I, §8, cl. 1. These were taxes that people could avoid by adjusting their behavior—generally, taxes on articles of consumption. See The Federalist No. 21, p. 116 (E. Scott ed. 1898) (A. Hamilton). "Indirect taxes" are not identified by that name in the Constitution. But, the Constitution's delineation of a direct-tax category signals the existence of a complementary indirect-tax category.

For each class of taxes, the Constitution limits Congress's power with a distinct rule. Direct taxes are subject to the rule of apportionment. The Constitution twice specifies that "direct Taxes shall be apportioned among the several States . . . according to their respective Numbers."[2] Art. I, §2, cl. 3; see also §9, cl. 4. A tax is apportioned among the States if "each State pays in proportion to its population." *National Federation of Independent Business* v. *Sebelius*,

―――――――――――

Clause above—is also an important "qualification on the substantive taxing power." *Health and Hospital Corporation of Marion Cty.* v. *Talevski*, 599 U. S. 166, 206 (2023) (THOMAS, J., dissenting). But, because this case does not implicate that limitation, I do not further explore the General Welfare Clause.

[2] Those "Numbers," were originally "determined by adding to the whole Number of free Persons . . . three fifths of all other Persons." Art. I, §2, cl. 3; but see Amdt. 14, §2.

6                     MOORE *v.* UNITED STATES

567 U. S. 519, 570 (2012). An example best demonstrates
what apportionment requires. Suppose that Congress im-
posed a direct tax on houses, and apportioned the tax such
that two States of equal population were both responsible
for paying $100 in taxes. If the first State contained 100
houses and the second State only 10, houses in the first
State would be taxed at $1 each ($100 divided by 100
houses), whereas houses in the second State would be taxed
at $10 each ($100 divided by 10 houses).

Indirect taxes are subject to the rule of uniformity: "[A]ll
Duties, Imposts and Excises shall be uniform throughout
the United States." Art. I, §8, cl. 1. The Court has ex-
plained that "the words 'uniform throughout the United
States' . . . signify . . . a geographical uniformity." *Knowlton*
v. *Moore*, 178 U. S. 41, 106 (1900). In other words, a "tax is
uniform when it operates with the same force and effect in
every place where the subject of it is found." *Head Money
Cases*, 112 U. S. 580, 594 (1884). So, a duty on the impor-
tation of tea must impose the same rate on imports coming
through Boston as those coming through Savannah.[3]

The Sixteenth Amendment, on its face, narrows the scope
of the apportionment requirement. While direct taxes must
be apportioned, the Sixteenth Amendment allows Congress

---

[3] For the sake of completeness, three remaining taxing provisions in
the Constitution of 1789 bear mentioning. First, "a Tax or duty may be
imposed" on the "Importation of such Persons as any of the States now
existing shall think proper to admit"—*i.e.*, upon the foreign slave trade—
"not exceeding ten dollars for each Person." Art. I, §9, cl. 1. Second, "[n]o
Tax or Duty shall be laid on Articles exported from any State." Cl. 5.
And third, "[n]o State shall, without the Consent of the Congress, lay any
Imposts or Duties on Imports or Exports" (with limited exceptions). §10,
cl. 2. Together, these provisions define the limits of state and federal
taxing power with respect to foreign and interstate commerce. I mention
them below only in passing. But, like the division between direct and
indirect taxes, these provisions reflect the delicate balance that the Con-
stitution struck regarding the scope of the federal taxing power.

THOMAS, J., dissenting

to tax incomes "without apportionment." But, it did not remove the Direct Tax Clause or the apportionment requirement from the Constitution entirely. To appreciate the extent of the change, and its implications for the meaning of the word "incomes," it is necessary to examine the origins of the Direct Tax Clause and how disputes about the Clause's scope led to the Sixteenth Amendment.

2

The Direct Tax Clause was a critical aspect of the balance between state and federal power in the original design of the Constitution. It is easy today to take the federal taxing power for granted. But, at the founding, allowing the National Government to exercise such a power was a radical proposal. The importance of the limitations imposed by the Direct Tax Clause to the compromise struck by the Constitution has significant implications for the meaning of "incomes" in the Sixteenth Amendment.

The American colonial experience inspired widespread distrust of taxation. See, *e.g.*, Declaration of Independence ¶19. The Articles of Confederation reflected that distrust. Under the Articles, the entire taxing power was exclusive to the States. The National Government had no power to impose taxes of any kind. The only revenue for the National Government was funds "supplied by the several States" pursuant to requisitions "in proportion to the value of all land within each State." Articles of Confederation, Art. 8. And, the taxes for paying those requisitions were imposed solely by the States themselves.

The requisition system showed immediate signs of inadequacy. Raising funds through requisitions was often ineffective because States felt little urgency to pay their obligations. See Federalist No. 30, at 160 (A. Hamilton) (explaining that requisitions were formally "obligatory upon the States," but that "in practice" the right to disregard them was "constantly exercised"). And, the financial

Thomas, J., dissenting

strain placed on the National Government by the Revolu-
tionary War made that inefficiency an existential threat to
the fledgling Nation.

The Continental Congress quickly concluded that financ-
ing the war effort would require another source of revenue
for the National Government.  "[T]o establish the national
credit," the Congress's finance Committee reported in De-
cember 1780, "it will be necessary" for the States to "vest[t]
in Congress" "[t]he exclusive right to duties arising on cer-
tain imported articles."  18 Journals of the Continental Con-
gress 1774–1789, p. 1157 (G. Hunt ed. 1910).  The Congress
therefore proposed the Impost of 1781, "recommend[ing] to
the several states, as indispensably necessary, that they . . .
vest a power in Congress, to levy for the use of the United
States, a duty of five per cent." on most imports.  19 Jour-
nals of the Continental Congress 112 (1912) (footnote omit-
ted).  The President of the Continental Congress transmit-
ted the proposal to the States on February 8, 1781, under a
cover letter stressing the "precarious Manner" in which
Congress had to fund the Army under the requisition sys-
tem.  5 Letters of Members of the Continental Congress 564
(E. Burnett ed. 1931).

Every State but Rhode Island approved the Impost of
1781.  See 1 Documentary History of the Ratification of the
Constitution 63 (M. Jensen ed. 1976) (Documentary His-
tory).  But, because the Articles of Confederation required
amendments like the impost to be approved unanimously,
Rhode Island's refusal defeated the amendment.  Articles of
Confederation, Art. 13; see also 23 Journals of the Conti-
nental Congress 783–784 (1914).  In a letter to the Confed-
eration Congress,[4] the Rhode Island Legislature explained
that it rejected the impost "[b]ecause it would be unequal in

---

[4] After the ratification of the Articles of Confederation in March 1781,
the Continental Congress became the Confederation Congress.  See 1
Documentary History 136.

THOMAS, J., dissenting

its operation, bearing hardest on the most commercial states," including Rhode Island. *Id.*, at 788. One State's jealousy of its lucrative tax base prevented the reform of the Articles' flawed requisition system.

A year later, the Confederation Congress again proposed a national taxing power with the Impost of 1783. The proposal languished for years, and then failed after New York refused its consent in February 1787. See 1 Documentary History 190, n. 3. As the second impost awaited its slow death, the Confederation Congress issued a dire warning about the financial condition of the National Government in February 1786. See 30 Journals of the Continental Congress 70, 75 (J. Fitzpatrick ed. 1934). Faced with mounting threats to the security of the country, and requisitions that had become "so irregular in their operation" as to be "dangerous to the welfare and peace of the Union," Congress asserted "that the crisis has arrived" when the people of the United States must decide whether, "for want of a timely exertion in establishing a general revenue," they will risk both the existence of the Union and the liberty that they won in the Revolution. *Id.*, at 72, 75.

The practical impossibility of reforming the Articles to include a national taxing power was among the primary reasons for the Constitutional Convention of 1787. John Adams later reflected as Vice President: "The opposition of Rhode Island to the impost seems to have been the instrument which providence thought fit to use for the great purpose of establishing the present constitution." 26 Documentary History 743 (J. Kaminski et al. eds. 2013). In February 1787, the Continental Congress endorsed the call for a convention of delegates in Philadelphia. See 32 Journals of the Continental Congress 74 (R. Hill ed. 1936). Virginia had been the first State to answer that call, and in appointing delegates, made prominent reference to the Confederation Congress's "alarming representations" about the poor state

of public finance. 1 Documentary History 196–198 (discussing Congress's warning of February 1786). The Virginia delegation likewise emphasized the "inefficiency of requisitions" when it opened the proceedings at the Convention. 1 Records of the Federal Convention of 1787, pp. 18–19 (M. Farrand ed. 1911) (Farrand's Records).

The possibility of a federal taxing power was highly controversial at the Constitutional Convention, despite widespread acknowledgment of the need to reform public finance. The Virginia plan—a broad outline that was selected as the basis for the new Government—did not go so far as to include a federal taxing power. The Virginia delegation apparently considered it less controversial to open the Convention with a proposal that gave the Federal Government the ability to enforce requisitions against the States by military force. *Id.,* at 21. The New Jersey plan, by contrast, did include federal taxing powers. *Id.,* at 243. Reason prevailed, and the Convention judged it more prudent to risk a federal taxing power than the extraction of federal revenue by the use of military force against the States. See *id.,* at 54 ("[Madison] observed that the more he reflected on the use of force [against delinquent States], the more he doubted the practicability, the justice and the efficacy of it"). The Convention proposed the Constitution with its taxing provisions as described above; they would be ratified unchanged. See 2 *id.,* at 590, 594, 596; *supra,* at 4–6.

Unsurprisingly, the proposed creation of a federal taxing power provoked many of the most passionate criticisms by opponents of ratification. The Antifederalists warned that a federal taxing power would destroy the state governments. Brutus wrote that the central question presented by ratification was "whether the thirteen United States should be reduced to one great republic . . . or whether they should continue thirteen confederated republics." Brutus No. 1 (Oct. 18, 1787), in 2 The Complete Anti-Federalist 364

THOMAS, J., dissenting

(H. Storing ed. 1981). In support of his dramatic thesis, Brutus asserted that "the individual states must very soon be annihilated," in part by the federal taxing power. *Id.*, at 365.

The destructive force of the federal taxing power, as Brutus explained it, arose from the fact that it forced the States to compete with the Federal Government for a tax base. Because the Constitution prevented the States from emitting paper money and laying duties or imposts, "[t]he only mean therefore left, for any State to support its government and discharge its debts, is by direct taxation." *Id.*, at 366. But, even the ability to resort to direct taxes would be fruitless, because the power of direct taxation was shared with the Federal Government. *Ibid.* Brutus thus argued that once the Federal Government "begins to exercise the right of taxation in all its parts, the legislatures of the several states will find it impossible to raise monies to support their governments" and then "dwindle away." *Ibid.* Other Antifederalists sounded the same theme at the state ratifying conventions. See, *e.g.*, 3 Debates on the Constitution 29 (J. Elliot ed. 1836) (Elliot's Debates) (George Mason arguing in Virginia that the "two concurrent powers" of the State and Federal Governments to impose taxes directly upon the people "cannot exist long together").

The Federalists' defense of the new national taxing power stressed that the Federal Government would impose direct taxes only sparingly, as needed to supplement the revenue from imposts in emergencies. Madison explained that "[w]hen . . . direct taxes are not necessary, they will not be recurred to. It can be of little advantage to those in power to raise money in a manner oppressive to the people." *Id.*, at 95. And, Federalists highlighted the protection provided by the rule of apportionment. Hamilton explained that direct taxes "never can oppress a particular state by an unequal imposition; because the Constitution has provided a

MOORE *v.* UNITED STATES

THOMAS, J., dissenting

fixed ratio, a uniform rule, by which this must be regulated." 2 *id.*, at 365. Madison argued that because representation and direct taxation were apportioned by the same formula, unjust taxes could not feasibly be imposed; those responsible for paying direct taxes are correspondingly able to defeat their imposition. See 3 *id.*, at 256–257.[5]

With the Constitution's ratification, the requisition system was replaced by a system that gave the Federal Government the taxing power it had lacked under the Articles of Confederation. That increase in power came at the expense of the States. The States gave up the power to tax interstate and foreign commerce, which was expected to be the main source of federal revenue. They did retain the power of direct taxation, but had to share it with the Federal Government—an arrangement that motivated significant opposition to the new Constitution. The limitations on the Federal Government's ability to exercise that concurrent power were thus an essential component of the constitutional compromise.

### 3

Postratification disagreement about what qualified as a "direct tax" would eventually lead to the adoption of the Sixteenth Amendment. Even though the distinction between direct and indirect taxes was an important component of

---

[5]Several state ratifying conventions proposed amendments to strengthen the protection provided by the Direct Tax Clause. For example, the Massachusetts ratifying convention proposed that the Constitution be modified to allow direct taxes only "when the moneys arising from the impost and excise are insufficient for the public exigencies," and even then only after Congress first attempted to obtain such funds through requisitions. 1 Elliot's Debates 322–323. The ratifying conventions of South Carolina, New Hampshire, New York, and Rhode Island concurred in the proposed amendment. *Id.*, at 325, 326, 329, 336. Although those proposals never became part of the Constitution, they demonstrate the importance that many ratifying States placed upon limitations to Congress's power to lay direct taxes.

THOMAS, J., dissenting

the founding compromise, it was not entirely clear how to distinguish between the two classes of taxes. The scope of the "direct tax" category proved immediately controversial. And, that controversy eventually came to bear on the question of income taxation, with the Court initially concluding that the Direct Tax Clause was not a barrier to taxing incomes.

As the Constitution's text made clear, a "Capitation" was "direct." Art. I, §9, cl. 3. And, all agreed that taxes on land and slaves were considered direct. See 3 Elliot's Debates 229. But, beyond that, the precise boundary between direct and indirect taxes was debatable. An exchange at the Constitutional Convention preserved in Madison's notes is often cited on the subject: "Mr King asked what was the precise meaning of *direct* taxation? No one answd." 2 Farrand's Records 350.

This Court grappled with the question in a significant case decided soon after ratification. In 1794, the Third Congress passed "An Act laying duties upon Carriages for the conveyance of Persons." Act of June 5, 1794, ch. 45, 1 Stat. 373. The tax was not apportioned among the States. Some opposed the tax on the theory that a tax on personal property, such as carriages, was a direct tax that required apportionment.[6]

When Daniel Hylton failed to pay the tax on his 125 carriages, the United States brought a suit against him, and the case soon found its way to the Supreme Court. *Hylton* v. *United States*, 3 Dall. 171, 171–172 (1796) (*Hylton's Case*). "The argument turned entirely upon . . . whether the tax . . . was a direct tax." *Id.*, at 172. The four Justices who

---

[6] James Madison, for example, despaired about the unconstitutionality of the tax in a letter to Thomas Jefferson. See 15 Papers of James Madison 327 (T. Mason, R. Rutland, & J. Sisson eds. 1985) ("And the tax on carriages succeeded in spite of the Constitution . . . . By breaking down the barriers of the constitution . . . wealth may find a precarious defence in the shield of justice").

sat for the case each agreed that the tax was constitutional, and the three who offered reasons suggested that "direct" taxes were limited to capitation and land taxes. But, they did so with some caution.

Justice Chase was "inclined to think, but [did] not give a judicial opinion, that the *direct* taxes contemplated by the Constitution, are only *two*, to wit, a *capitation,* or *poll* tax, *simply*, without regard to *property, profession,* or any *other circumstance*; and a tax on LAND." *Id.,* at 175. He "doubt[ed] whether a tax, by a *general assessment* of *personal* property, . . . is included within the term *direct* tax." *Ibid.* Justice Paterson observed that "[w]hether direct taxes, in the sense of the Constitution, comprehend any other tax than a capitation tax, and tax on land, is a questionable point." *Id.,* at 177. Justice Iredell opined that "[p]erhaps a direct tax in the sense of the Constitution, can mean nothing but a tax on something inseparably annexed to the soil . . . . A land or poll tax may be considered of this description." *Id.,* at 183.

Additional disputes over what constituted direct taxation arose when the Government resorted to new forms of taxation to finance the Civil War. In several cases decided shortly after the war, the Court relied on *Hylton's Case* to conclude that new taxes were indirect. First, the Court reasoned that "[i]f a tax upon carriages, kept for his own use by the owner, [was] not a direct tax," then "a tax upon the business of an insurance company" was not a direct tax. *Pacific Ins. Co.* v. *Soule,* 7 Wall. 433, 446 (1869). Next, the Court concluded that a tax on the circulation of bank notes was also indirect, but it surveyed ratification-era sources to hint at a slightly more expansive definition of direct taxes. *Veazie Bank* v. *Fenno,* 8 Wall. 533, 544 (1869) ("direct taxes were such as may be levied by capitation, and on lands and appurtenances; or, perhaps, by valuation and assessment of personal property upon general lists"). Finally, the Court concluded that a tax on the devolution of title to real estate

was indirect, acknowledging that "it never ha[d] been de-cided" whether any taxes besides "[t]axes on lands . . . and capitation taxes" were "direct taxes." *Scholey* v. *Rew,* 23 Wall. 331, 347 (1875).

The Civil War also prompted Congress to enact the Na-tion's first-ever federal income tax. In 1861, Congress im-posed a tax of three percent "upon the annual income of every person residing in the United States, whether such income is derived from any kind of property, or from any profession, . . . or from any other source whatever," to the extent that income exceeded $800. §49, 12 Stat. 309. Over the course of the Civil War, the income tax was paid by as many as 1 in 10 Union households and accounted for about a fifth of federal revenues. S. Weisman, The Great Tax Wars 101–102 (2002) (Weisman). The tax remained in force, with modifications, until it expired in 1871. §6, 16 Stat. 257.

The Court did not consider the constitutionality of the Civil War income tax until a decade after its expiration, in *Springer* v. *United States,* 102 U. S. 586 (1881). The "main question" was whether the tax was an unapportioned direct tax that violated the Direct Tax Clause. *Id.,* at 595. The Court held that the income tax was not a direct tax. Relying heavily on *Hylton's Case,* the Court reasoned that "*direct taxes,* within the meaning of the Constitution, are only cap-itation taxes . . . and taxes on real estate." 102 U. S., at 602. Accordingly, the income tax at issue was "within the cate-gory of an excise or duty." *Ibid.*[7]

---

[7] In the case before us, the Government relies heavily on another case involving the Civil War income tax, *Collector* v. *Hubbard,* 12 Wall. 1 (1871). According to the Government, *Hubbard* "upheld [Congress's] power to" impose "taxes on undistributed corporate earnings" as "income taxes," a result that subsequent decisions "temporarily undermined" un-til "the Sixteenth Amendment . . . reinstat[ed]" it. Brief for United States 9. But, *Hubbard* is of virtually no relevance to the Sixteenth Amend-ment. Contrary to the Government's assertions, the taxpayer in *Hub-*

16 MOORE *v.* UNITED STATES

THOMAS, J., dissenting

In summary, after disputes over the scope of the Direct Tax Clause between the founding and the expiration of the Civil War income tax, the Court apparently concluded that direct taxes were limited to poll taxes and taxes on land. *Ibid*. But, the Court expressed some doubt as to the proper classification of taxes "levied by . . . valuation and assessment of personal property." *Veazie Bank*, 8 Wall., at 544. Based on that narrow reading of the Direct Tax Clause, the Court upheld the Civil War income tax against a constitutional challenge. But, the long-running skirmishes about direct taxation would soon come to a dramatic climax following the imposition of the first federal income tax in peacetime.

4

I next consider the single most important piece of context for understanding the Sixteenth Amendment: *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, the case that the Amendment overruled. In *Pollock*, the Court concluded, for the first time, that a tax was direct, not apportioned, and therefore unconstitutional. The Court's reasoning turned on the premise that the Constitution permits no distinction between taxing income and taxing the source from which that income is derived. The holding of *Pollock* thus meant that most income taxes would have to be apportioned, a requirement that made them politically unpalatable. See *supra*, at 6 (describing possible state-by-state variations in rates for apportioned taxes). Because the Sixteenth

---

*bard* made a statutory argument about the meaning of the word "entitled," not any argument about the scope of Congress's power. See Brief for Respondent in *Collector* v. *Hubbard*, O. T. 1870, No. 122, p. 4. Nor did *Hubbard* uphold the tax as an income tax. Instead, it interpreted the statute as a tax on a shareholder's *property rights* in undistributed profits. 12 Wall., at 18. Because the taxpayer did not bring a constitutional challenge based on the Direct Tax Clause, the Court had no occasion to consider the potential implications of treating the tax as a property tax.

THOMAS, J., dissenting

Amendment overruled the result in *Pollock*, an accurate understanding of the case is essential to understanding the Amendment.

Congress imposed the Nation's first peacetime income tax as part of the Revenue Act of 1894.  The Act paired a new tax on the incomes of the wealthiest two percent of Americans with tariff cuts that would benefit less wealthy consumers.  See Weisman 132–133, 145.  The income-tax component of the Act provided:

> "That [from 1895 until 1900] there shall be assessed, levied, collected, and paid annually upon the gains, profits, and income received in the preceding calendar year by [citizens and resident aliens], whether said gains, profits, or income be derived from any kind of property, rents, interest, dividends, or salaries, or from any profession, trade, employment, or vocation . . . , or from any other source whatever, a tax of two per centum on the amount so derived over and above four thousand dollars." §27, 28 Stat. 553.

The income tax was not apportioned among the States by population.

In *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429 (1895), the Court considered whether the 1894 income tax was a direct tax that failed to satisfy the Direct Tax Clause's apportionment requirement.  The taxpayer argued that portions of the tax were direct because "imposing a tax on the income or rents of real estate, imposes a tax upon the real estate itself." *Id.*, at 555.  And, taking the position that taxes on personal property are also direct taxes, the taxpayer argued that "imposing a tax on the . . . income of bonds or other personal property . . . imposes a tax on the personal estate itself." *Ibid.*

The Court endeavored to determine what "were recognized as direct taxes" "at the time the Constitution was framed and adopted." *Id.*, at 558.  The Court considered

historical context, the records of the Constitutional Conven-
tion, the Federalist Papers, other documents from the rati-
fication debates, the 1794 carriage tax, and *Hylton's Case*.
157 U. S., at 558–568, 570–572. The Court concluded that
"all taxes on real estate or personal property or the rents or
income thereof were regarded as direct taxes" at the time
the Constitution was ratified. *Id.*, at 573–574. After reach-
ing a conclusion about the original meaning of the Consti-
tution, the Court surveyed its precedents and observed that
"in none of them is it determined that taxes on rents or in-
come derived from land are not taxes on land," and that
"none . . . discussed the question whether a tax on the in-
come from personalty is equivalent to a tax on that person-
alty." *Id.*, at 579. The Court had some difficulty explaining
*Springer*, which stated that direct taxes are limited to cap-
itation and land taxes and concluded that a tax on income
was an indirect tax. See *supra*, at 15. But, the Court re-
turned to "[t]he original record" in *Springer* to review the
sources of the taxpayer's income, and it distinguished the
case on that ground. 157 U. S., at 578–579.

In the end, the Court concluded that income could not be
distinguished from the source from which it was derived for
purposes of determining whether a tax on that income
would be direct or indirect. It was "unable to perceive any
ground" "upon which to rest the contention that real estate
belongs to one of the two great classes of taxes," *i.e.*, the direct-
tax class, "and the rent or income which is the incident of
its ownership belongs to the other," *i.e.*, the indirect-tax
class. *Id.*, at 581. It grounded that conclusion in the fact
that the Direct Tax Clause was a federalism provision at
the heart of the constitutional compromise: "If, by calling a
tax indirect when it is essentially direct, the rule of protec-
tion could be frittered away, one of the great landmarks de-
fining the boundary between the Nation and the States of
which it is composed, would have disappeared, and with it
one of the bulwarks of private rights and private property."

THOMAS, J., dissenting

*Id.*, at 583.

The Court held that the Act was unconstitutional in part, "so far as it levies a tax on the rents or income of real estate." *Ibid.* But, the Justices divided evenly on the question whether the tax was unconstitutional "as to the income from personal property." *Id.*, at 586. The case was therefore scheduled for rehearing.

After rehearing, the Court extended its logic and held that a tax on income derived from personal property—like a tax on income derived from real property—was a direct tax. 158 U. S., at 625. The Court offered a more thorough explanation for why income could not be distinguished from its source when classifying a tax. It began by observing that the distinction between direct and indirect taxes was critical to our system of federalism. By ratifying the Constitution, the States "gave up the great sources of revenue derived from commerce" and "retained the power of direct taxation," but only concurrently with the Federal Government. *Id.*, at 620. Limitations on federal direct taxation offered state governments a fiscal safe haven against expanding federal authority, in recognition of the fact "that the power to tax involved the power to destroy." *Id.*, at 621. "[T]he qualified grant" of an apportioned direct-taxation power built security into the "structure of the government itself . . . by providing that direct taxation and representation in the lower house of Congress should be adjusted on the same measure." *Id.*, at 621–622.

The Court relied on those federalism principles to reject the argument "that income is taxable irrespective of the source from whence it is derived." *Id.*, at 629. It explained that the Constitution—read "in its plain and obvious sense" and in the context of "the circumstances attending the formation of the government"—could not be understood to treat income "as belonging to a totally different class" of taxation than the class "which includes the property from

whence the income proceeds." *Id.*, at 627–628. Such an in-
terpretation would leave the Direct Tax Clause "utterly il-
lusory and futile, and the object of its framers defeated."
*Id.*, at 628. The Court refused to allow the effect of the Di-
rect Tax Clause to be "refined away by forced distinctions
between" income and source. *Ibid.*

### 5

The Sixteenth Amendment was designed to overrule *Pol-
lock*'s obstacle to an income tax, and it was understood by
the public in those terms. *Pollock* stood in some tension
with the Civil War tax cases, and it was not well received.
Critics likened it to *Dred Scott* v. *Sandford*, 19 How. 393
(1857), and the decision became a major issue in the 1896
Presidential election. Weisman 148. By the 1908 Presiden-
tial election, both major political parties supported finding
a way, *Pollock* notwithstanding, to impose an income tax.
See E. Seligman, The Income Tax 591–592 (2d ed. 1914).

In 1909, President Taft pledged his support for an income-
tax amendment. In a widely published message to Con-
gress, he explained that "[t]he decision of the Supreme
Court" in *Pollock* "deprived the national government of a
power which" it "ought to have." Taft Asks for Tax, Wash-
ington Post, June 17, 1909, p. 4. Taft therefore asked Con-
gress to "propose an amendment to the Constitution confer-
ring the power to levy an income tax upon the national
government without apportionment." *Ibid.*

Shortly after the President delivered his message, Sena-
tor Norris Brown of Nebraska proposed an income-tax
amendment providing: "The Congress shall have power to
lay and collect direct taxes on incomes without apportion-
ment among the several States according to population." 44
Cong. Rec. 3377 (1909). The proposed amendment's narrow
focus on an income tax was significant. After all, a consti-
tutional amendment could have easily eliminated *Pollock*'s
obstacle to income taxation by removing the Constitution's

THOMAS, J., dissenting

direct-tax provisions wholesale.[8]

A few weeks later, the proposed amendment emerged from Committee in its modern form. It is not clear how the original proposal's reference to "direct taxes" was removed, or how the phrase "from whatever source derived" was added. See E. Jensen, The Taxing Power, the Sixteenth Amendment, and the Meaning of "Incomes," 33 Ariz. St. L. J. 1057, 1116–1117 (2001). The Amendment was passed by Congress on July 12, 1909. See 44 Cong. Rec. 4440. And, the Secretary of State certified that the Amendment had been ratified by the States on February 25, 1913. 37 Stat. 1785.

## B

With a full understanding of the context against which the Sixteenth Amendment was ratified, two conclusions become clear. First, because the Amendment abolished *Pollock*'s rule that an income tax must be classified as direct or indirect based on whether a tax on the *source* of that income would be direct or indirect, the Amendment created a constitutional distinction between income and its source. Second, because Sixteenth Amendment "income" must be distinguished from its source, the Amendment includes a realization requirement.

### 1

I return, finally, to the text of the Sixteenth Amendment: "The Congress shall have power to lay and collect taxes on

---

[8] In fact, that possibility was suggested on the Senate floor as soon as the proposed amendment was read. 44 Cong. Rec. 3377 ("[I]f the Senator from Nebraska will change his amendment to the Constitution so as to strike out" all references to direct taxes, "he will accomplish all that his amendment proposes to accomplish and not make a constitutional amendment for the enacting of a single act of legislation"). But, Senator Brown responded that his "purpose [was] to confine it to income taxes alone." *Ibid.*

incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."  Against the background of *Pollock*, the "power to lay and collect taxes on incomes, from whatever source derived, without apportionment" under the Sixteenth Amendment has an obvious and narrow meaning.  The only thing the Amendment changed about the Constitution was to abolish *Pollock*'s rule that an income tax is a direct tax if a tax on the source of the income would be a direct tax.  The Sixteenth Amendment left everything else in place, including the federalism principles bound up in the division between direct and indirect taxes.

The Court was first asked to interpret the Sixteenth Amendment in *Brushaber* v. *Union Pacific Railroad Co.*, 240 U. S. 1.  A taxpayer raised an exhaustive set of "twenty-one constitutional objections" to the first income tax under the Sixteenth Amendment.  *Id.*, at 10.  Recognizing that the text of the Amendment could not be understood in a vacuum, the Court began with the text of the original taxing provisions and the history of the disputes over direct taxes from *Hylton's Case* to *Pollock*.  240 U. S., at 12–17.  I can little improve on *Brushaber*'s explanation of the Sixteenth Amendment.

"[T]he whole purpose of the Amendment was to relieve all income taxes . . . from apportionment [based on] a consideration of the source whence the income was derived."  *Id.*, at 18.  *Pollock* stood for the rule that "whether a tax on income [is] direct" must be determined based upon a consideration of "the property from which the income [is] derived."  240 U. S., at 18.  It was by "the rule applied in the *Pollock Case* . . . alone" that income "taxes were removed from the great class of [indirect taxes] and were placed under the . . . direct class."  *Id.*, at 19.  The Amendment did nothing more than remove that rule.  The result was "the prevention of the resort to the sources from which a taxed income was derived in order to . . . place [an income tax] in the class of direct

taxes." *Ibid.* But, other than that change, the Amendment "was drawn with the object of maintaining the limitations of the Constitution," including *Pollock*'s holding that direct taxes included "taxes levied directly on personal property because of its ownership." *Ibid.*

The Sixteenth Amendment thus facilitated an income tax by creating a new constitutional distinction between "income" and its "source." Under the Amendment, "from whatever source" income is "derived," a tax on it is indirect and therefore not subject to the rule of apportionment. But, as to taxes on the sources of income, the restrictions imposed by the division between direct and indirect taxes continued to apply with full force. And, taxes on property continued to be classified as direct taxes.

### 2

Because the Sixteenth Amendment requires a way to distinguish between income and source, it includes a realization requirement. The text of the Amendment incorporates such a requirement, and the concept of realization was well understood at the time of ratification. The Constitution thus limits unapportioned income taxes to taxes on *realized* income.

The word "income" in the Sixteenth Amendment must be interpreted in light of the Amendment's distinction between income and source. As the Court appreciated in *Eisner* v. *Macomber*, failure to understand "income" in this way leads to an interpretation of the Sixteenth Amendment that mistakenly displaces aspects of the original taxing provisions that the Amendment left in place: "In order, therefore, that the clauses cited from Article I of the Constitution may have proper force and effect, save only as modified by the Amendment, and that the latter also may have proper effect, it becomes essential to distinguish between what is and what is not 'income.'" 252 U. S., at 206.

Without an understanding of "income" that distinguishes

it from "source," the Sixteenth Amendment undermines the restriction imposed by the Direct Tax Clause. The Government asserts that the Sixteenth Amendment uses "'income' . . . to refer to all economic gains." Brief for United States 14 (some internal quotation marks omitted). That understanding of "income" would allow taxes on real and personal property without apportionment. To be sure, most of the Government's arguments focus on "taxes on individuals' pro rata shares of undistributed corporate earnings." *Id.*, at 13. But, the Government is not shy about the fact that its definition of income includes things such as "increase in the value of a corporation's capital assets," "increase in the value of unsold property," and "appreciation in the value of securities." *Id.*, at 16 (alterations and internal quotation marks omitted). Those increases are "income" in a purely economic sense, but not in a sense that meaningfully distinguishes between "income" and the "source" from which it is "derived." A tax on each, whether it be an increase in assets, unsold property, or securities, would be a tax on the value of real estate or property, and should therefore require apportionment under the Direct Tax Clause.

The text of the Sixteenth Amendment points to the concept of realization, as the Court explained that concept in *Macomber*. The Amendment is clear that the word "income" refers to something that is "derived." Dictionaries at the time of ratification defined "derive" as "[t]o receive, as from a source or origin" and "to draw." Webster's New International Dictionary 601 (1913) (Webster's). And, that sense of "derived" maps neatly onto *Macomber*'s realization-focused definition of "income" as being "*received* or *drawn by* the recipient (the taxpayer) for his *separate* use." 252 U. S., at 207.

In fact, the idea of realization as the distinction between income and source long predates both *Macomber* and the Sixteenth Amendment. As the Government acknowledges, "the concept" of "realization . . . was well established when

THOMAS, J., dissenting

the Amendment was adopted." Brief for United States 15. The term *"realized"* appeared in several Civil War income tax provisions. *Id.*, at 16 (citing §116, 13 Stat. 281; §7, 16 Stat. 257–258). And, contemporaneous "[d]ictionaries defined 'realize' as 'to convert any kind of property into money.'" Brief for United States 15–16 (quoting Webster's 1778, and citing Black's Law Dictionary 993 (2d ed. 1910); alteration omitted). The Government argues that the decision to omit the often-used word "realized" from the Sixteenth Amendment is significant evidence that the Amendment does not require realization. See Brief for United States 16. But, the choice to instead use the near-synonym "derived" merely reflects the repeated use of the word "derive" to describe the relationship of income to its source in *Pollock*, to which the Sixteenth Amendment was a direct response. See 158 U. S., at 618, 629, 635.

The metaphor that the Court famously used in *Macomber* also shows the deep roots of the realization concept. To illustrate the "fundamental relation of 'capital' to 'income,'" *Macomber* compared "the former . . . to the tree or the land, [and] the latter to the fruit or crop." 252 U. S., 206. That understanding of income as being something *"severed from"* its source predated the Sixteenth Amendment. In a well-cited case from 1878, the Georgia Supreme Court relied on a tree-and-fruit analogy in a tax case to explain the difference between income and property: "The fact is, property is a tree; income is the fruit." *Waring* v. *Mayor and Aldermen of Savannah*, 60 Ga. 93, 100 (1878); see also Black's Law Dictionary, at 612 (defining "income" (citing *Waring*, 60 Ga., at 99)).

The text of the Sixteenth Amendment, read against the background of its adoption, confirms that the "incomes" that the Sixteenth Amendment allows Congress to tax without apportionment are only *realized* incomes. We granted certiorari in this case to answer whether Congress may "tax unrealized sums without apportionment among

the states." Pet. for Cert. i. As the Sixteenth Amendment makes clear, the answer to that question is a resounding "no." The Court errs today by failing to correct the Ninth Circuit's contrary understanding.

*      *      *

It is imperative to give the original taxing provisions in Article I their proper effect. Those provisions reflect a delicate compromise under which the founding generation took the great risk of ceding much of the States' exclusive taxing authority to the Federal Government. *Supra*, at 7–12. Without that compromise, the Constitution could easily have been rejected. To be sure, the States slightly altered the original agreement by ratifying the Sixteenth Amendment. But, a constitutional amendment does not affect our duty of fidelity to the aspects of the original agreement that remain in place—including the Direct Tax Clause. If a written constitution is to mean anything, the compromises it records must bind us until we amend them.

## II

The Court strains to uphold the Mandatory Repatriation Tax without addressing whether the Sixteenth Amendment includes a realization requirement, the question we agreed to answer in this case. The majority starts by surveying a scattered sampling of precedents—mostly about tax avoidance—to invent an "attribution" doctrine that sustains the MRT. The majority also relies on "longstanding congressional practice" to conclude that the Moores' claim fails because they cannot distinguish the MRT from similar taxes imposed by Congress in the past, which the Moores concede are constitutional. Neither point can withstand scrutiny.

### A

To avoid the question whether the Sixteenth Amendment requires realization, the majority reframes the case as be-

ing about whether Congress may attribute an entity's real-
ized income to shareholders or partners. *Ante*, at 8. Ac-
cording to the majority, our precedents establish a "clear
rule" that the Sixteenth Amendment empowers Congress to
choose whether "to tax [an] entity on its income" or instead
"tax the entity's shareholders or partners on their share of
the entity's undistributed income." *Ante*, at 17. Applying
this rule, the Court concludes that the MRT permissibly
chooses to attribute undistributed income earned by foreign
corporations to their American shareholders. The Court
thus refuses to address the "Government's argument that a
gain need not be realized to constitute income under the
Constitution" because the foreign corporation has realized
the income. *Ante*, at 12–13, n. 3.

The majority's Sixteenth Amendment "attribution" doc-
trine is a new invention. The majority justifies its creation
by plucking superficially supportive phrases from an eclec-
tic selection of tax cases. But, none of the cases supports
the proposition that the Sixteenth Amendment empowers
Congress to freely attribute income to any taxpayer it rea-
sonably chooses.

The majority begins with *Burk-Waggoner Oil Assn.* v.
*Hopkins*, 269 U. S. 110 (1925), a case that it says "articu-
lated [the] fundamental principle" that "Congress could tax
. . . income as it ch[ooses]," either by taxing an entity or an
individual. *Ante*, at 9. But, *Burk-Waggoner* merely held
that Congress may tax a *de facto* corporation on its own in-
come, even if it is formally a partnership under state law.
See 269 U. S., at 114 ("[N]othing in the Constitution pre-
cludes Congress from taxing as a corporation an association
which, although unincorporated, transacts its business as
if it were incorporated"). Tellingly, we have never cited
*Burk-Waggoner* for the proposition derived by the majority,
but instead for the proposition that federal statutes "de-
signed to tax income actually earned . . . are not to be frus-
trated by state laws." *Commissioner* v. *Tower*, 327 U. S.

280, 288 (1946) (citing 269 U. S., at 114); see also *Lyeth* v. *Hoey*, 305 U. S. 188, 194 (1938) (same); *Hemphill* v. *Orloff*, 277 U. S. 537, 550 (1928) (same). *Burk-Waggoner* thus shows that state law may not be used as a means of evading federal taxes—not that Congress may choose whether to attribute income to entities or individuals.

The majority then cites *Burnet* v. *Leininger*, 285 U. S. 136 (1932), which it says "reiterated" that Congress can choose to impose income-tax liability "'upon [a] partnership directly'" or "'upon the individuals carrying on business in partnership.'" *Ante*, at 9 (quoting 285 U. S., at 142; internal quotation marks omitted). But, the majority quotes language that is part of a due process holding, not an application of the Sixteenth Amendment. *Leininger* involved a taxpayer's attempt to evade taxation by assigning half of his share in a partnership's income to his wife. *Id.*, at 138. The taxpayer argued that assessing income taxes against him based on "a partnership interest owned by his wife" violated the Fifth Amendment's Due Process Clause. Brief for Respondent in *Burnet* v. *Leininger*, O. T. 1931, No. 426, p. 24. The Court rejected the argument, concluding that it did not violate due process to "tax the distributive share of each partner" by ignoring the taxpayer's attempt to divert his income to his wife. 285 U. S., at 142. The majority is clear that it offers no opinion about due process questions. See *supra*, at 4–5, nn. 4, 6. Because *Leininger* is a due process case, it is unclear how it supports the majority's Sixteenth Amendment attribution doctrine.

Next, the majority claims that the Court "reaffirmed that Congress may choose to tax either [a] partnership *or* [its] partners" in *Heiner* v. *Mellon*, 304 U. S. 271 (1938), when it rejected the argument by members of a partnership "that Congress could not tax them on income that they did not and could not personally receive." *Ante*, at 10. But, *Heiner* is a statutory interpretation case. Under the applicable

THOMAS, J., dissenting

statute, the taxpayers were subject to a tax on their "distributive share, whether distributed or not, of the net income of the partnership." §218(a), 40 Stat. 1070. The taxpayers argued only that "there was no distributive share" within the meaning of the statute, because distribution was currently impossible under state law; they made no argument about the scope of Congress's power. Brief for Respondents in *Heiner* v. *Mellon*, O. T. 1937, No. 144 etc., p. 34. *Heiner*'s interpretation of the statutory phrase "distributive share" cannot be understood as a holding about the scope of Congress's supposed attribution power.

The majority completes its survey of "attribution" precedents with *Helvering* v. *National Grocery Co.*, 304 U. S. 282 (1938), which it says extended *Heiner*'s attribution principle from partnerships to corporations. *Ante*, at 10. But, *National Grocery* demonstrates Congress's ability to legislate against tax-avoidance schemes—not an ability to freely attribute corporate income to shareholders. The majority misleadingly describes *National Grocery* as involving "the controlling shareholder of a corporation" being taxed "individually . . . on the year's profits." *Ante*, at 10 (internal quotation marks omitted). In reality, the case involved a tax paid by a corporation—owned 100% by one person—after the corporation permitted profits to accumulate without distribution "'for the purpose of preventing the imposition of [a] surtax upon [the] sole stockholder.'" 304 U. S., at 285. In essence, the sole stockholder used the corporation as a tax-free bank account to hold what was really his income. The Court concluded that Congress may legislate to prevent "the sole owner of [a] business" from "conducting it as a corporation" to avoid the tax consequences that would attach if the business had "been carried on as a partnership." *Id.*, at 288. The Court cited *Heiner* merely to explain those tax consequences, not to support an attribution principle. *National Grocery* is yet another tax-evasion case, not an application of an attribution principle.

At most, the cases cited by the majority demonstrate that Congress may attribute income to the entity or individual who actually controlled it when necessary to defeat attempts to evade tax liability. They do not suggest that Congress may freely choose whether to impose an income tax on a corporation or on its shareholders. The "clear rule" that the majority relies on to sidestep the realization question is thus a mirage. *Ante*, at 17.

B

The majority separately concludes that the Moores' claim fails because they cannot distinguish the MRT from other longstanding taxes that they concede are constitutional. The majority sees no distinction between the MRT and older taxes on partnerships, "S corporations," and closely held foreign corporations under other parts of subpart F. *Ante*, at 16–21. But, the majority's insistence that the MRT is just like other forms of pass-through taxation is not convincing.

First, the MRT's taxation of corporate shareholders is not like pass-through taxation of partners. The Moores are correct that the Sixteenth Amendment allows Congress to tax partners on partnership income because "partnerships hav[e] no existence separate from their partners." Brief for Petitioners 51. A partner's share of partnership income is therefore understood to be his own income. The majority quibbles with the Moores' understanding of early-20th century partnership law and points out that "legislatures treated partnerships as separate entities in many contexts," including for some tax purposes. *Ante*, at 17–18. But, the fact that a partnership can sometimes be treated as an entity is beside the point. The significant fact is that partners had long been considered to be subject to income taxes without consideration of the partnership; longstanding taxes based on that understanding are not implicated by the Moores' challenge to the MRT.

THOMAS, J., dissenting

Second, and for similar reasons, the MRT's taxation of corporate shareholders is not like pass-through taxation of shareholders of "S corporations." An S corporation is a corporation that does not have more than 100 shareholders, does not have any shareholder who is not an individual or who is a nonresident alien, does not have more than one class of stock, and which elects to be treated as an S corporation. 26 U. S. C. §§1361(a)(1), (b)(1). These eligibility requirements make it clear that pass-through taxation of S corporations is merely an extension of the pass-through taxation of partnerships. Indeed, for most tax purposes, S corporations are equivalent to partnerships, not to corporations. "Tax practitioners often say that an S corporation is taxed like a partnership." CCH S Corp. Guide ¶510, p. 505 (2013); see also West's Tax Law Dictionary (2024) (defining "S Corporation" as "Corporation which elects S status and receives tax treatment similar to a partnership"). Taxing S corporation shareholders on corporate income is constitutional for the same reasons as taxing partners on partnership income. To the majority, "S corporations are another example of Congress's authority to either tax the corporation itself on corporate income or attribute the undistributed income to the shareholders and tax the shareholders." *Ante,* at 19. But, it does not make sense to look to S corporations for conclusions about the pass-through taxation of corporate shareholders generally.

Finally, the MRT is unlike other taxes on shareholders of closely held foreign corporations. The MRT "differs from other provisions of Subpart F"—the portion of the Internal Revenue Code dealing with controlled foreign corporations—because the MRT does not focus on "the corporation's receipt of investment earnings while subject to the shareholders' control." Brief for Petitioners 44–45. Subpart F "aligns the corporation's earning of the money being taxed with the shareholder's control *in the same year*." Reply Brief 23. But, "[t]he MRT by its terms takes no account

of whether a shareholder had any interest or control when the corporation made the earnings that it attributes to her." *Ibid.* In fact, the MRT "tags a shareholder with taxable 'income' even if" he purchased shares "long after the corporation earned the sums being taxed," and it imposes no liability on taxpayers who owned shares for years of retained earnings but sold them before the MRT's trigger date. Brief for Petitioners 45. Subpart F includes some minimal requirements to ensure that taxable "income" belongs to the shareholder in some way; the MRT abandons that effort entirely.

The majority concludes that "the MRT . . . has the same essential features as subpart F." *Ante*, at 21. But, unlike the rest of subpart F, the MRT has no connection at all to any "recognition event" or "constructive receipt of income," and it offers no "rational basis for Congress to attribute *income* to a taxpayer." S. McElroy, The Mandatory Repatriation Tax Is Unconstitutional, 36 Yale J. Reg. Bull. 69, 80–81 (2018). The MRT turns solely on the ownership of stock on a certain date. That is a significant difference between the MRT and the rest of subpart F, and one with constitutional implications.

The fact that the MRT has novel features does not mean that it is unconstitutional. But, the MRT is undeniably novel when compared to older income taxes, and many of those differences are constitutionally relevant. Because the MRT is imposed merely based on ownership of shares in a corporation, it does not operate as a tax on income.

C

The majority is not ashamed to lay bare the consequentialist heart of its opinion. Because it wrongly concludes that the Moores' constitutional argument would invalidate not only the MRT but also other longstanding taxes, the majority frets that the Moores would "deprive the U. S. Government and the American people of trillions in lost tax

THOMAS, J., dissenting

revenue" and "require Congress to either drastically cut critical national programs or significantly increase [other] taxes." *Ante*, at 21. "The Constitution does not require that fiscal calamity," the majority proclaims. *Ibid*. I agree. But, if Congress invites calamity by building the tax base on constitutional quicksand, "[t]he judicial Power" afforded to this Court does not include the power to fashion an emergency escape. Art. III, §1, cl. 1.

Even as the majority admits to reasoning from fiscal consequences, it apparently believes that a generous application of dicta will guard against unconstitutional taxes in the future. The majority's analysis begins with a list of nonexistent taxes that the Court does not today bless, including a wealth tax. *Ante,* at 8, n. 2. And, it concludes by offering a narrow interpretation of its own holding, hinting at limiting doctrines, prejudging future taxes, cataloguing the Government's concessions, and reserving other questions "for another day." *Ante*, at 22–24. Sensing that upholding the MRT cedes additional ground to Congress, the majority arms itself with dicta to tell Congress "no" in the future. But, if the Court is not willing to uphold limitations on the taxing power in expensive cases, cheap dicta will make no difference.

### III

The Court today upholds the MRT, but not because it endorses the Ninth Circuit's erroneous view that "realization of income is not a constitutional requirement." 36 F. 4th, at 936. The majority acknowledges that the Sixteenth Amendment draws a distinction between income and its source. *Ante*, at 7. And, it does not dispute that realization is what distinguishes income from property. *Ante*, at 8. Those premises are sufficient to establish that realization is a constitutional requirement. Sixteenth Amendment "income" is only realized income. We should not have hesitated to say so in this case. I respectfully dissent.